12 A.3d 291

COMMONWEALTH of Pennsylvania, Appellee

v.

Dustin Ford BRIGGS, Appellant.

Supreme Court of Pennsylvania.

Submitted Dec. 3, 2008.

Decided Jan. 19, 2011.

432

434

438

440

444

George Edward Lepley Jr., Lepley, Engelman & Yaw, L.L.C., Williamsport, for Dustin Ford Briggs.

James Patrick Barker, Patrick J. Blessington, PA Office of Attorney General, Norristown, Amy Zapp, Harrisburg, for Commonwealth of Pennsylvania.

CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, ORIE MELVIN, JJ.

## *OPINION*

Justice TODD.

Dustin Briggs appeals from the sentence of death imposed on March 15, 2006 by the Bradford County Court of Common Pleas after a jury found him guilty of two counts of first-degree murder,[1] and one count of robbery.[2] After careful review, for the reasons set forth herein, we affirm Appellant's convictions of these offenses as well as his judgment of sentence.

We begin by reviewing the factual occurrences giving rise to Appellant's convictions, as gleaned from the certified record in this matter. On the morning of Wednesday, March 31, 2004, Appellant was eating breakfast with his then-girlfriend April

1. 18 Pa.C.S.A. § 2502.
2. 18 Pa.C.S.A. § 3701.

Harris Duva ("Duva") at the Bradford County home where he lived with his father, Arlan Briggs. N.T. Trial, 1/24/06 AS,[3] at 72, 115. A driveway led to Briggs' house from Congdon Road, and the house was the first structure a person traveling the driveway from that road would encounter. As the driveway continued past the house, it divided into two parts, with the left fork leading to a barn and the right fork to a stand of pine trees. The majority of the Briggs property behind the house was used as an automotive junkyard and was littered with hundreds of derelict vehicles. N.T. Trial, 1/24/06 MS, at 6–7; N.T. Trial, 1/23/06 AS, at 10–11.

Once Appellant finished eating, he left the house to go to work in the junkyard pulling radiators from cars. N.T. Trial, 1/24/06 AS, at 72. As Duva was washing the dishes, Arlan Briggs, who had been out in the junkyard cleaning radiators, entered the house and tried to call his daughter on the phone. N.T. Trial, 1/25/06 MS, at 18. As he hung up the phone, he noticed a car parked outside of the house. N.T. Trial, 1/24/06 AS, at 72–73. The car was an unmarked police vehicle driven by Bradford County Sheriff's Deputies Christopher Burgert and Michael VanKuren, who had come to serve arrest warrants on Appellant and Duva. Appellant's warrant was for non-payment of fines, costs, and restitution, while Duva's warrant was for the alleged manufacture of methamphetamine on the Briggs property. N.T. Trial, 1/24/06 AS, at 45–46, 71–72. Arlan Briggs knew of the existence of these warrants and, thus, told Duva to hide—whereupon she hurriedly ran to the basement. N.T. Trial, 1/25/06 MS, at 18–19; N.T. Trial, 1/24/06 AS, at 74.

The deputies knocked twice at the door, but Arlan Briggs stayed out of sight and did not answer. N.T. Trial, 1/25/06 MS, at 21; N.T. Trial, 1/24/06 AS, at 74. Once the deputies ceased knocking, Arlan Briggs looked out the window and could no longer see their car, so he decided to go back outside.

---

**3.** Because there are separate volumes of the notes of testimony for the morning and afternoon sessions of the *voir dire* and trial, we will designate throughout the notes of testimony from the morning sessions as "MS" and the afternoon sessions as "AS."

Duva, who was secreted in the furnace room in the basement, heard Arlan Briggs leave the house through the kitchen door and, thereafter, heard three gunshots. While exiting his house on the way to the barn, Arlan Briggs, who suffered from significant hearing loss, heard the sounds also, but he characterized them as banging noises which, at the time, he attributed to Appellant's work removing the radiators. N.T. Trial, 1/24/06 AS, at 74; N.T. Trial, 1/25/06 MS, at 23.

Arlan Briggs proceeded to the barn, where he began to sort some of the radiators stored therein with the intent of salvaging the usable ones. After he had found two in acceptable condition, he carried them out of the barn and began walking with them towards the right fork of the driveway. At this point, he noticed the deputies' car parked in the drive about 200 feet from the house, with Appellant's Chevy Blazer positioned directly in front of it. N.T. Trial, 1/25/06 MS, at 25. After Arlan Briggs had walked further up the driveway into the junkyard to where his own pickup truck was parked he, at that point, noticed Deputy VanKuren prone and unmoving on the ground. Id. at 29. He also observed Deputy Burgert lying in the yard nearby, gravely wounded. Id. at 30. Arlan Briggs then ran back to his house, called 9-1-1, and urgently requested assistance. Id. at 31–32. He also told Duva to get dressed and leave the property, as there was "trouble" and the two deputies were dead. N.T. Trial, 1/24/06 AS, at 84–85.

According to testimony at Appellant's trial provided by Bradley Brown, an individual who had been a friend of Appellant for ten years, and who became a cellmate of Appellant after his arrest, Appellant admitted to Brown that he was the one who had shot the deputies. Brown testified that Appellant described to him the manner in which the shooting transpired as follows. Appellant was in the process of pulling a radiator out of a car when the deputies walked up behind him and called his name. N.T. Trial, 1/26/06 MS, at 13. Appellant claimed that he had a previous altercation with Deputy VanKuren and, hence, felt he was in fear for his life. As Appellant turned around in response to the deputies' call, he reached for his hip, on which he had a holstered revolver. Id. at 13. After the deputies informed Appellant that he was

under arrest, Deputy VanKuren attempted to unholster his own weapon, and Appellant reacted by pulling his gun out and shooting Deputy VanKuren twice. *Id.* at 13, 35.

Appellant next pointed his gun at Deputy Burgert and shot him twice, once in the abdominal region and once in the chest. Because of his wounds, Deputy Burgert fell to the ground, and Appellant advanced on him—pressing his now empty gun to Deputy Burgert's face. N.T. Trial, 1/26/06 MS, at 15. Appellant demanded Deputy Burgert throw his service weapon, a .40 caliber "Glock" semiautomatic pistol, to the ground and, after Deputy Burgert complied, Appellant picked it up and pointed it at him. *Id.* at 15–16; N.T. Trial, 1/30/06 MS, at 106. At this point, Deputy Burgert reached up to grab the gun and it went off. N.T. Trial, 1/26/06 MS, at 18. Appellant ran from the shooting scene, hastily changed clothes, and left the area. N.T. Trial, 1/26/06 MS, at 18.

According to the testimony of forensic pathologist Dr. Samuel Land, who conducted the post-mortem examinations of the slain deputies, the autopsy results of Deputy VanKuren showed that he was shot once in the right upper chest, and the bullet passed through his right lung, severed his spinal cord, and came to rest lodged in his spinal column.[4] N.T. Trial, 1/30/06 MS, at 42. Dr. Land opined that Deputy VanKuren was immediately paralyzed by this wound and suffered massive bleeding into his chest, which caused his death within minutes. *Id.* at 46, 52. Dr. Land noted that Deputy VanKuren was additionally shot a second time in his right forearm. *Id.* 48. When this bullet entered Deputy VanKuren's forearm it fractured it. *Id.* at 49. The bullet then continued through the forearm and into his wrist, broke it, and then, finally, came to rest there.[5] *Id.* at 49.

Dr. Land also testified that the results of Deputy Burgert's autopsy showed he was shot in both the chest and abdomen. One of the bullets entered the right side of Deputy Burgert's

4. As discussed, *infra,* ballistics testing would establish that this bullet was fired from a Smith and Wesson .357 Magnum revolver.

5. Subsequent test results on this bullet were inconclusive due to its mutilated condition, and, thus the caliber of firearm from which it originated could not be established. N.T. Trial, 1/30/06 MS, at 113.

chest, traveled through his lungs, piercing them both, and then exited the top of his left chest.[6] N.T. Trial, 1/30/06 MS, at 53. The destructive force of this bullet's trajectory caused Deputy Burgert's right lung to collapse and his chest cavity to fill with blood which eventually resulted in his asphyxiation. *Id.* at 53–54, 63. The second bullet which entered Deputy Burgert's abdomen did not penetrate fully, having been stopped by his bulletproof vest in which it became wedged.[7] N.T. Trial, 1/30/06 MS, at 63. Additional autopsy findings indicated that Deputy Burgert suffered a separate bullet wound to the fourth finger of his right hand. The bullet which caused this wound also fractured the index finger of his right hand and traveled through to strike him in the right thigh where it became imbedded. N.T. Trial, 1/30/06 MS, at 55–57, 61–62.[8] The medical examiner indicated that Deputy Burgert died within minutes from the effects of these multiple gunshot wounds. *Id.* at 64, 69.

After the shooting of the deputies, Appellant immediately became the subject of a massive manhunt by police. On the next evening, Thursday, April 1, 2004, Appellant emerged from the woods and walked up the driveway of an acquaintance, Neal Saunders, who was standing in the driveway at the time with his next-door neighbor. Saunders' home was located within a mile of the Briggs' property. N.T. Trial, 1/23/06, at 50. Appellant asked Saunders for a drink of water, and Saunders allowed him to drink from an outdoor spring. N.T. Trial, 1/25/06 AS, at 60. Appellant also requested to use Saunders' phone to call his brother, and Saunders agreed. Appellant dialed his brother's number twice and received no response. After Appellant hung up the phone, Appellant asked Saunders what "the word" was in the community, and Saunders told him people were blaming him for killing the two deputies. *Id.* at 62. Appellant then nodded his head. Appel-

6. This bullet was never recovered.

7. As noted, *infra,* this bullet was subsequently determined to have been fired from the same Smith and Wesson .357 Magnum revolver as the bullet lodged in Deputy VanKuren's spinal column.

8. This bullet was later ascertained to have been fired from Deputy Burgert's Glock service revolver.

lant asked Saunders if he would give him a ride to his brother's place, but Saunders refused and asked him to leave. Saunders also requested that Appellant turn himself in, and Appellant replied that he would like to, but would prefer to "have a chance with a lawyer" first. *Id.* at 64.

After Appellant left, Saunders called police, who converged on the area. Within an hour, state troopers in an unmarked car spotted Appellant crossing a wooded ravine near Saunders' house; whereupon, they surrounded and arrested him. N.T. Suppression Hearing, 11/10/04, at 5–7. Appellant, who was wet and cold, was placed in the back of the state police vehicle and covered with emergency blankets to help warm him. *Id.* at 8. One of the troopers, Trooper Vincent Schreffler, gave Appellant *Miranda*[9] warnings at that time which, according to Trooper Schreffler, Appellant indicated he understood. *Id.* at 9–11. Trooper Schreffler asked Appellant if he wished to speak with them, and he replied "don't know." *Id.* at 11. Trooper Schreffler next asked Appellant "where the gun was at," and Appellant offered no response. *Id.* at 12.

Appellant was transported to the State Police Barracks in Towanda. *Id.* At this point, Appellant was released into the custody of Trooper David Pelachick. Trooper Schreffler informed Trooper Pelachick that he had read Appellant his *Miranda* rights. *Id.* at 13. Appellant was also given a sandwich and drink, which he consumed. *Id.* at 20. Trooper Pelachick, in the company of another state police officer, Trooper James Kerrick, proceeded to advise Appellant of the specific charges against him as listed in the criminal complaint, and Appellant indicated he understood the nature of those charges. Trooper Pelachick testified he told Appellant he would like to "give him an opportunity to explain his actions." *Id.* at 21. According to Trooper Pelachick, Appellant responded that he wanted to talk to the troopers, but also that he wanted his attorney, Art Agnellino, to be present when he did so. *Id.* The troopers offered to find Appellant another attorney, but he refused the offer, stating he wished to wait

9. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

for Attorney Agnellino. *Id.* at 22. The troopers called Attorney Agnellino, but failing to reach him, left a message. *Id.* The troopers discontinued their attempts to interview Appellant that evening, and Appellant was taken to be arraigned—following which he was transferred to the Bradford County Jail. *Id.* at 23.

The next day, Friday April 2, 2004, Attorney Agnellino called the State Police barracks in the morning and informed them that he would not be representing Appellant. *Id.* at 24. Later that afternoon, sometime after 4:00 p.m., Trooper Pelachick and Trooper Kerrick went to the jail to speak with Appellant and to tell him of Attorney Agnellino's decision. *Id.* at 24, 33. Appellant was brought to a medical examination room in the jail where the troopers and two jail correctional officers were present. *Id.* at 25. Trooper Pelachick informed Appellant that Attorney Agnellino had declined to represent him. Trooper Pelachick asked Appellant whether he would like to speak with them without an attorney, or if he would like to find another attorney. *Id.* at 27. Appellant stated that he wanted to talk to the troopers, but reiterated that he wanted an attorney present with him when he did so, and he expressed his desire to get a public defender. *Id.*

Trooper Pelachick testified that, after Appellant had made the request for a public defender, he told Appellant that he would not be able to speak with him that day but would talk to him later, with his attorney. *Id.* at 28. Trooper Pelachick told Appellant he believed he was making "a wise decision" in wanting to talk to them and explain his actions. *Id.* at 27, 29. Trooper Pelachick told Appellant that "just because someone doesn't talk to us doesn't mean that they couldn't be convicted." *Id.* at 29. Trooper Pelachick related that he informed Appellant of the case of another individual, John Kohler, who, in Trooper Pelachick's words, "never told us his side of the story, but . . . he ended up getting the death penalty anyway." *Id.* Trooper Pelachick also told Appellant "it will be your decision whether you tell us or not, but your attorney's going to probably advise ya's [sic] not to." According to Trooper Pelachick, Appellant responded: "I know the deal, I've been through this before." *Id.*

Due to the lateness of the hour and the approaching weekend, Trooper Pelachick inquired whether Appellant wanted the troopers to contact the public defender so that they could arrange a meeting with him on Monday, or, whether he preferred they wait to hear from the public defender. *Id.* at 29–30. Trooper Pelachick testified that Appellant replied: "no, let's go ahead and make this, let's get the ball rollin', let's shoot for Monday, you guys make the arrangements." *Id.* at 30.

Trooper Pelachick then told Appellant, "well, we'll see you, I guess we'll see you Monday, or try to make it, try to . . . see you on Monday." *Id.* At this point, Trooper Pelachick and Trooper Kerrick, as well as the two prison guards, started walking towards the door to leave the room but stopped when they heard Appellant sobbing loudly. *Id.* at 30–31. Trooper Pelachick looked back at Appellant and saw him leaning against a table with his head down and heard him say: "I'm sorry, I'm sorry, tell their families I'm sorry, I didn't mean to kill them." *Id.* at 31. Upon hearing this, Trooper Pelachick asked Appellant if he would like to talk to them now without an attorney. Appellant answered, "no, no, I want to talk to you . . . no disrespect, I'm not trying to give you a hard time, but I want to wait until my attorney gets here." *Id.* at 31–32. Trooper Pelachick told Appellant that they would hopefully see him Monday, after which the troopers departed. *Id.* Appellant subsequently had no further interviews with the troopers.

A little over three months later, on July 7, 2004, two boys pursuing a skunk through the woods within a mile of the Briggs property overturned some rocks in a pile during their search and discovered two guns underneath, one a Smith and Wesson .357 Magnum revolver, and the other Deputy Burgert's "Glock" service pistol. N.T. Trial, 1/23/06 AS, at 47, 50; N.T. Trial, 1/26/06 MS, at 53, 64; N.T. Trial, 1/30/06 MS, at 106–107. Additionally, secreted in a cavity underneath the rock were four unfired bullets, three of which were .357 Magnum cartridges and one which was a .38 caliber car-

tridge—all of which a state police ballistics expert testified were capable of being fired from the Smith and Wesson .357 Magnum revolver. N.T. Trial, 1/30/06 MS, at 109. The Glock, which has a fifteen round capacity, had only fourteen rounds in it at the time of its discovery. Subsequent ballistics tests performed on both recovered weapons indicated that the bullet lodged in Deputy Burgert's bulletproof vest and the one imbedded in the vertebrae of Deputy VanKuren's lower back came from the Smith and Wesson .357 Magnum revolver. N.T. Trial, 1/30/06 MS, at 112. The tests further established that the bullet taken from Deputy Burgert's thigh was fired from the Glock pistol. *Id.* In addition, ballistics tests showed that seven Winchester .357 Magnum shell casings recovered from various places on the ground in the Briggs' junkyard were discharged from the Smith and Wesson .357 Magnum revolver. N.T. Trial, 1/30/06 MS, at 101–102, 113.

Prior to the commencement of Appellant's trial, the then-District Attorney of Bradford County, Stephen Downs, requested, via letter, that the office of the Pennsylvania Attorney General intervene to assume prosecution of the case, and the attorney general agreed. Appellant filed four pretrial motions seeking a change of venue for the trial, a motion to remove the attorney general as prosecutor, and a motion to suppress the statements which he made to the troopers at the prison. Because of the recusal by both judges of the Court of Common Pleas of Bradford County, Senior Judge Barry Feudale, President Judge Emeritus of Northumberland County, was appointed to specially preside over this case. Judge Feudale denied all of Appellant's motions.

Appellant proceeded to a jury trial before Judge Feudale, which began on January 23, 2006. In addition to the evidence the Commonwealth presented, detailed above, Appellant called two witnesses, Sally and Harvey Ferris, who testified that Arlan Briggs had admitted that he shot one of the deputies, and his son, Mark Briggs, shot the other. N.T. Trial, 1/31/06 AS, at 92. According to Sally Ferris, who was the mother of Duva, Arlan Briggs told her that he had washed his hands with vinegar to remove the gunpowder residue and, also, that he melted the guns down so the police could not find them;

however, by her account, Arlan Briggs later changed his story and told her he hid them in a ravine. *Id.* at 95–97, 106.

Ultimately, the jury found Appellant guilty on February 7, 2006, and the death penalty phase of the trial began the next day, February 8, 2006. On February 9, 2006, the jury—having found, beyond a reasonable doubt, the existence of five aggravating factors [10] and, by a preponderance of the evidence, one mitigating factor,[11] and that the aggravating factors outweighed the mitigating factor, returned a sentence of death, which the trial court imposed on March 15, 2006. Appellant next filed a direct appeal to our Court.[12, 13]

## I.

## SUFFICIENCY OF THE EVIDENCE

Although Appellant does not presently challenge the sufficiency of the evidence to support his conviction, it is this

10. The jury found the existence of the following aggravating factors to have been proven beyond a reasonable doubt: (1) Appellant killed law enforcement officer Christopher Burgert while he was performing his duty, 42 Pa.C.S.A. § 9711(d)(1); (2) Appellant killed law enforcement officer Michael VanKuren while he was performing his duty, 42 Pa. C.S.A. § 9711(d)(1); (3) the commission of the act of first degree murder of Deputy VanKuren knowingly created a grave risk of death to Deputy Christopher Burgert, 42 Pa.C.S.A. § 9711(d)(7); (4) the commission of the act of first degree murder of Deputy Christopher Burgert knowingly created a grave risk of death to Deputy VanKuren, 42 Pa.C.S.A. § 9711(d)(7); and (5) with respect to Deputy Burgert's murder, Appellant was convicted of another murder committed at the same time—the murder of Deputy VanKuren, 42 Pa.C.S.A. § 9711(d)(11).

11. The jury found one mitigating circumstance regarding the character and record of Appellant and the circumstances of his offense.

12. Pursuant to 42 Pa.C.S.A. § 9711(h)(1) our Court automatically reviews all sentences of death.

13. In this appeal, Appellant presents 18 issues for our consideration. To facilitate ease of discussion, they have been renumbered and grouped into six general categories: issues involving the trial court's denial of certain pretrial motions; issues arising during the jury selection process; issues relating to evidentiary matters pertaining to the guilt phase of the trial; challenges to the trial court's instructions to the jury before deliberating during the guilt phase of the trial; challenges to the trial court's instructions for deliberations during the penalty hearing; and general claims regarding the constitutionality of Pennsylvania's death penalty statute and execution procedure.

Court's well-established practice in all direct appeals from the imposition of a judgment of sentence of death to determine if the trial evidence is legally sufficient for a jury to have convicted the appellant of the offense of first-degree murder. *Commonwealth v. Smith,* 604 Pa. 126, 985 A.2d 886, 894 (2009). The standard of review our Court utilizes in examining the sufficiency of the evidence requires that we consider the evidence admitted at trial in a light most favorable to the Commonwealth, since it was the verdict winner, and grant it all reasonable inferences which can be derived therefrom. *Commonwealth v. Eichinger,* 591 Pa. 1, 16, 915 A.2d 1122, 1130 (2007). The evidence, so viewed, will be deemed legally sufficient to sustain the jury's conviction on appeal only if it proves each element of the offense charged beyond a reasonable doubt. *Commonwealth v. Wright,* 599 Pa. 270, 291, 961 A.2d 119, 130 (2008).

 Thus, in order for a first-degree murder conviction to be sustained, the Commonwealth is required to introduce evidence at trial which establishes beyond a reasonable doubt the following factors: (1) a human being was unlawfully killed; (2) the accused bears responsibility for the killing; and (3) the accused acted with malice and a specific intent to kill. *Commonwealth v. Reed,* 605 Pa. 431, 436, 990 A.2d 1158, 1161 (2010); 18 Pa.C.S.A. §§ 2501, 2502(a).[14] The Crimes Code defines an intentional killing as a "[k]illing by means of poison, or by lying in wait, or by any other kind of willful, deliberate, and premeditated killing." 18 Pa.C.S.A. § 2502(d). The Commonwealth may meet its burden of proof to show that the accused intentionally killed the victim through the use of wholly circumstantial evidence, such as evidence which shows

14. Even though the term malice is not specifically referenced in 18 Pa.C.S.A. § 2502, our Court has recognized in prior decisions that malice remains a necessary element of the crime of first-degree murder. *See, e.g., Commonwealth v. Laird,* 605 Pa. 137, 988 A.2d 618, 624 (2010); *Commonwealth v. Montalvo,* 604 Pa. 386, 986 A.2d 84, 92 (2009). It is the presence of malice which distinguishes the offense of first-degree murder from other lesser crimes also involving an intentional and unlawful taking of a human life, such as voluntary manslaughter where the killer possesses an unreasonable belief the killing was justifiable. *See* 18 Pa.C.S.A. § 2503(b).

the use of a deadly weapon by the accused on a vital part of the victim's body. *Smith*, 604 Pa. at 142, 985 A.2d at 895; *Commonwealth v. Watkins*, 577 Pa. 194, 209, 843 A.2d 1203, 1211 (2003). Likewise, malice may also be inferred from the use of a deadly weapon on a vital portion of the victim's body. *Commonwealth v. Rawles*, 501 Pa. 514, 522, 462 A.2d 619, 623 (1983). The definition of a deadly weapon furnished by the Crimes Code includes "[a]ny firearm, whether loaded or unloaded." 18 Pa.C.S.A. § 2301; *Commonwealth v. Scott*, 561 Pa. 617, 622 n. 5, 752 A.2d 871, 874 n. 5 (2000).

■ The trial evidence, as recounted above, is amply sufficient to sustain Appellant's conviction for the offense of first-degree murder. Appellant expressly admitted to his friend Bradley Brown that he shot the deputies as they attempted to take him into custody, and he again acknowledged his responsibility for causing their deaths when he made his tearful post-arrest declaration to Trooper Pelachick and the other individuals present in the Bradford County Jail Infirmary.[15] Although Appellant told Brown that he feared for his life from a prior altercation with Deputy VanKuren, there was no evidence which indicated that the deputies did anything whatsoever which would have justified Appellant's use of lethal force in response. To the contrary, Appellant's statement to Brown establishes that the deputies merely spoke to Appellant and called him by name, and Appellant responded to their simple attempt to communicate with him by reaching for his weapon, drawing it, and shooting them both. Consequently, their killing at Appellant's hands was manifestly unlawful.

Although Appellant denied in his declaration at the jail infirmary that he meant to kill the deputies, the specific manner in which he shot each of them belies this claim. Using a Smith and Wesson .357 Magnum revolver, Appellant shot, at close range, Deputy VanKuren twice in the chest and

15. Appellant's admission to Brown was corroborated by another witness, Mark Marcoccia, a mutual friend of both, who testified that Appellant showed him Brown's statement during a conversation in the prison law library, and, in response to questioning from Marcoccia, acknowledged that the statement was an accurate reflection of what had happened. N.T. Trial, 1/27/10 MS, at 70.

Deputy Burgert once in the chest and once in the abdomen. The chest and abdomen house the human body's chief circulatory and digestive organs, as well as a network of vital arteries and veins which supply them and, thus, are vital areas of the body. Appellant's deliberate and repeated use of a firearm to shoot the deputies in those areas clearly establishes his specific intent to kill both men with malice. The evidence was therefore sufficient to support the jury's conviction of Appellant for two counts of first-degree murder.

## II.

## CHALLENGES TO TRIAL COURT RULINGS ON PRETRIAL MOTIONS

### A. Denial of Appellant's motions for change of venue

Appellant first contends the trial court abused its discretion by denying his motions for a change of venue of his trial from Bradford County. Before his trial began, Appellant made four separate motions to change the venue of his trial from Bradford County. In support of his first change of venue motion, Appellant submitted to the trial court four packets of newspaper articles taken from papers with circulation in Bradford County, as well as videotapes of television coverage—all of which related details of the death of the deputies and the events which transpired thereafter.[16] Additionally, Appellant submitted photos of a memorial erected inside the courthouse to the deputy sheriffs after their death, photos of white memorial placards in memory of the deputies displayed on vehicles surrounding the Bradford County Courthouse, and census data regarding the population of Bradford County,

16. All of the actual newspaper articles and videotapes submitted to the trial court by Appellant in support of his motions for change of venue, while accepted into evidence by that court, were not furnished to this Court as part of the record of this appeal. Aspects of the coverage may be gleaned, however, from the parties' on-the-record descriptions at the hearings held on Appellant's motions for change of venue, the transcripts of the *voir dire* proceedings, and from the trial court's findings made in each of its opinions regarding Appellant's respective motions.

fixing its total number of adult residents at 47,739. See N.T. Hearing, 1/7/05, at 2–6.

The trial court conducted a hearing on the first change of venue motion on January 7, 2005 at which time it entertained argument. Appellant, through counsel, argued at the hearing that the media coverage was extensive, sustained, and pervasive based on the fact that 117 articles had appeared in the Bradford County papers alone since the time of the shootings. Appellant additionally contended that, because this coverage mentioned his confession, it was inherently prejudicial as a result. Appellant posited that coverage would only increase by the time of trial, and coupled with the visibility of the memorials in the courthouse and on vehicles, was going to result in a situation where, by the time of trial, nearly every one of the County's residents, due to its size, was going to have formed an opinion. *Id.* at 6–10.

The Commonwealth [17] countered by arguing that the nature of the coverage was not prejudicial or inflammatory since one of the articles specifically mentioned that there were more "questions raised than answers" after Appellant's preliminary hearing, and another article quoted a defense attorney as saying that the defense had evidence that "someone else is the killer." *Id.* at 11. The Commonwealth asserted that the mention of the confession was infrequent, having been mentioned, by its accounting, only once on television. Though acknowledging it was discussed widely in the newspapers at various points, the Commonwealth pointed out the coverage had diminished significantly by the time of the hearing. The Commonwealth further maintained that the defense had established in the media coverage its position that the comments Appellant made in the jail were not an admission of guilt but rather an expression of regret so the prejudice had been minimized. *Id.* at 12–13. The Commonwealth emphasized that the trial court should consider not only the nature of the

17. Because the trial court had granted former District Attorney Downs' request for the Office of the Attorney General to assume prosecution of this case, the Commonwealth was represented at all pretrial hearings and at trial by Deputy Attorney General Patrick Blessington.

coverage but also whether there had been a sufficient "cooling off" period for any potential prejudice from the media coverage to have dissipated.

After consideration, the trial court denied the motion, without prejudice to the Appellant to raise it again at the time of individual *voir dire.* The court explained its rationale in its opinion, thusly:

A review of [Appellant's] exhibits ... reflecting the multimedia coverage of this case supports the contention that 'contemporaneous' to the homicides (i.e. coverage during the manhunt, capture of the Defendant, funeral of the Deputies and filing and updating of the charges) the publicity in this case was sustained and arguably pervasive. However, in our view the coverage was factual and objective and was not slanted towards conviction. While there were admittedly a few references to arguably presumptively prejudicial information, such was not sustained or pervasive, nor so inculpatory or inflammatory ... to support a change of venue/venire without establishing a nexus between the publicity and actual juror prejudice. Clearly, the deaths of two respected law enforcement officers in a small county such as Bradford, warrants caution and careful consideration as to a change of venue/venire to insure a fair trial. As noted by two citizen comments in one of the videotapes we 'never had a tragedy of this magnitude in this County[,]' and '[the deceased deputies] won't be forgotten.'

However, the relevant question is not whether the community remembered the case or will forget Deputies Van-Kuren or Burgert, but whether the prospective jurors have such fixed opinions that they can't judge impartially the alleged guilt of the [Appellant].

Additionally as noted by the comments of the prosecutor and defense counsel at argument and in the news articles, this case (given the history of [Appellant's] requests for recusals, discovery and pretrial motions, as well as motions by the Commonwealth) is not likely to be ready to proceed to trial until 'spring or early summer.' Therefore, the existence of a significant 'cooling off period' may minimize

any potential effects of the initially more sustained publicity surrounding the events at issue.

Trial Court Opinion, 2/14/05, at 1 n. 1 (citations omitted).

As permitted by the trial court, Appellant renewed his motion for change of venue prior to the start of individual *voir dire.* In the hearing on this motion, conducted on December 5, 2005, Appellant submitted an additional four packets of materials relating to media coverage of the case since the January change of venue hearing. Appellant argued that the prejudicial nature of this coverage, coupled with what he claimed were the high number of responses by prospective jurors to written questionnaires mailed to them and returned indicating their belief in Appellant's guilt, justified a change of venue.[18] Appellant claimed that, overall, 63 percent of the jurors in the pool of prospective jurors summoned to the courthouse for the trial expressed a belief in his guilt; however he estimated that approximately 36 to 37 percent had indicated in their responses that they could not change that belief. N.T. Hearing, 12/5/05, at 12, 23.

The Commonwealth responded by noting that the volume and nature of the media coverage at the time preceding jury selection could not be considered to have risen to the level where the community was saturated with inflammatory and prejudicial information. The Commonwealth averred that the correct test was not whether the prospective jurors had formed an opinion, but, rather, whether they could set aside that opinion and decide the case at trial. The Commonwealth proffered that the true question before the court was whether a fair and impartial jury could be selected in Bradford County, and it submitted that the questionnaires showed that one could be. The Commonwealth disputed Appellant's estimate of the number of jurors who had formed a fixed opinion and calculated, based on the questionnaires, that the number of

**18.** Pursuant to Pa.R.Crim.P. 632(F) original jury questionnaires are required to be destroyed unless preserved by order of court at the request of the attorney for the defendant, or the Commonwealth. The record does not reflect the entry of any such preservation order in this case and, thus, the juror questionnaires were presumably destroyed by the trial court in compliance with this rule.

jurors who had formed a fixed opinion numbered only 62 out of the 310 summoned, or roughly 20 percent. *Id.* at 13–15, 19. Thus, the Commonwealth maintained that a jury who had not prejudged the case could be selected from this pool of prospective jurors.

After deliberation, the trial court rejected the second motion for change of venue. In his opinion, Judge Feudale described his impression of the nature of the media coverage since the first *voir dire* hearing as well as the role of the jury questionnaires in his decision-making process, stating:

A review of the exhibits reflected in the marked articles by the Daily and Sunday Review, Sayre Morning Times, Star Gazette and Rocket Courier, along with miscellaneous other media, reflects as anticipated, a clear reduction ('cooling off') in media coverage since we have last reviewed the reporting on this case. Clearly, the more extensive coverage occurred contemporaneous to the murders, the 'massive manhunt,' preliminary hearing; and the funerals attended by many law enforcement personnel out of respect to fellow law enforcement officers who died in the line of duty. Subsequent coverage was clearly not pervasive, sustained, or prejudicial. In fact, we arrived in Bradford County on Sunday night and a perusal of the local newspaper (Daily/Sunday Review) reflected no articles on the day of, or preceding jury selection.

As to the jury questionnaires, such were utilized as an aid to facilitate jury selection and where appropriate, the excusal/exclusion of appropriate jurors. Such are not in and of themselves 'outcome determinative,' absent a showing that a prospective juror could not be fair and impartial due to an unalterable/uncompromising fixed bias.

Trial Court Opinion, filed 12/6/05, at 1–2.

After the jury selection process was well underway, with approximately 108 jurors individually questioned, and ten jurors seated, Appellant renewed his request for a change of venue. Judge Feudale, who personally presided over the selection process, considered how it had transpired to that

point and the relative number of challenges for cause and peremptory challenges which had been utilized. He concluded that he was satisfied with the conduct of the selection process and, consequently, denied the motion. N.T. Hearing, 12/13/05, at 4–5.

Finally, Appellant made his fourth change of venue motion after the 12 regular trial jurors had been seated and two alternate jurors were selected. Due to a bomb threat phoned in to the courthouse on the morning of December 15, 2005, the trial court resumed the individual *voir dire* proceedings for the selection of alternate jurors in the afternoon at the office of a local district magistrate. Prior to the resumption of the *voir dire,* Appellant renewed his motion for change of venue predicated on the alleged influence of the bomb threat on the jury. Appellant, however, presented no evidence to indicate the threat had any impact on either the jurors who had already been empanelled, or those remaining in the jury pool, and the trial court, discerning no adverse effect on the jury by the shift in the situs of the proceedings, and, consequently, no prejudice to Appellant, denied the motion. N.T. Voir Dire, 12/15/05 AS, at 4.[19]

Appellant presently argues the trial court abused its discretion in denying his motions for a change of venue—contending that this denial violated his right to a fair and impartial trial under the United States Constitution and Pennsylvania Constitution.[20] Appellant asserts that the pretrial publicity sur-

19. Appellant does not instantly advance any argument in his brief to our Court regarding the impact of the bomb threat on his constitutional right to a trial by an impartial jury and, as a result, we will not address this issue. *See Commonwealth v. Boxley,* 596 Pa. 620, 633, n. 7, 948 A.2d 742, 749 n. 7 (2008) (refusing to address claim which appellant raises to the trial court but subsequently abandons in his brief to our Court); *Commonwealth v. LaCava,* 542 Pa. 160, 176, n. 9, 666 A.2d 221, 228 n. 9 (1995) (holding issue which was not mentioned or developed in an appellate brief is waived).

20. The Sixth Amendment to the United States Constitution, which is applicable to the states through the Fourteenth Amendment, provides in relevant part:

In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed . . .

rounding his case was sustained, pervasive, and highly prejudicial. As evidence of this assertion he refers to media coverage which he alleges contained information that he had been previously convicted of pulling a gun on police officers during an altercation in New York State, that he had a " 'violent history,' " and that he had made a " 'jailhouse confession.' " Appellant's Brief at 10. Appellant notes that the information regarding his prior conviction and violent history came from former District Attorney Downs and resulted in "sensational, inflammatory, and emotional reporting."[21] *Id.*

United States Constitution, Amendment VI.
Article 1, Section 9 of the Pennsylvania Constitution, in pertinent part, states:
In all criminal prosecutions the accused hath a right to ..., in prosecutions by indictment or information, a speedy public trial by an impartial jury of the vicinage....
Pennsylvania Constitution Art.1, Section 9.

21. These facts were apparently gleaned, at least in part, by news sources from the following relevant excerpts from the letter former District Attorney Downs wrote to Deputy Attorney General Richard Sheetz, Chief of the Criminal Law Division of the Office of Attorney General, requesting the Office of the Attorney General assume the prosecution of the case:
Dear Attorney Sheetz:

\*　　\*　　\*

Judge Barry Feudale of Northumberland County has now been assigned to the case, and hearing on Briggs' Omnibus Pretrial Motions are [sic] currently scheduled to be heard by Judge Feudale in Bradford County on September 16, 2004 at 10:30 a.m. Among other matters Briggs['] Omnibus Pretrial Motions [seek] a change of venue for the trial as well as a motion to suppress an unmirandized oral inculpatory statement allegedly made by Briggs to investigators at the Bradford County Correctional Facility a few days after his arrest, and after Briggs had invoked his right to counsel. Since I was a party to the arrangements which had the investigators at the jail with Briggs, I should testify as a witness for the Commonwealth at the suppression hearing because my testimony might help to establish that the investigators went to the Bradford County Correctional Facility to facilitate the speedy appointment of counsel for Briggs (who had insisted that he wanted to talk to investigators but wanted counsel present) rather than to engage in custodial interrogation of Briggs, or to seek spontaneous admissions from him.
Because Bradford County is a rural county I worked closely with the fallen deputies, and I may be perceived as having a conflict of interest in prosecuting Briggs, or in seeking the death penalty against him. Likewise, my closeness to the fallen deputies might well interfere with my ability to clearly identify and deal with potentially

Appellant avers the ensuing media coverage was sustained and pervasive, and saturated the community. He presently renews his argument made to the trial court that, due to Bradford County's small population, this type of negative reporting was likely to have had a significant effect on any pool of prospective jurors comprised of the county's residents. Although Appellant concedes there had been an 18 month "cooling off period" between the time of the crime and the time of jury selection, Appellant maintains this was insufficient to dispel the prejudice of the media accounts. In support of his contention, as he did before the trial court, Appellant again relies on the written responses given by the prospective jurors when they filled out their questionnaire. Appellant alleges that 63 percent of all responding jurors indicated they believed Appellant was guilty. The total pool of prospective jurors was divided into "sessions," and of the two sessions from which jurors were finally selected, panels 15 and 16, Appellant claims 40% of panel 15 and 42% of panel 16 indicated they had a fixed opinion of Appellant's guilt. Appellant argues this was an extremely high number, and suggests that this approaches the 53 percent of prospective jurors questioned in *Commonwealth v. Cohen*, 489 Pa. 167, 413 A.2d 1066 (1980), who were excluded from serving because they admitted, in individual *voir dire*, to having a fixed and unalterable opinion of the defendant's guilt—a percentage our Court deemed to have been a significant factor indicating a change of venue was necessary.

Appellant also maintains that no significant cooling off period had occurred before jury selection and, in support, cites

problematic legal issues in this prosecution. Likewise, my anger that the Sheriff of Bradford County may have been reckless in allowing a lone pair of his deputies to seek to apprehend Briggs on a warrant at Briggs' own isolated rural property, without backup, notwithstanding that it was apparently well known that Briggs had been convicted of pulling a gun on police officers in New York State in a previous incident, might also create a real or apparent conflict of interest for me to prosecute Briggs.

\* \* \*

Letter of former District Attorney Stephen Downs to Attorney General ("Downs Letter"), 8/17/04, at 2–3, reproduced in full in Trial Court Opinion, 5/27/2005, at 4–5.

the testimony of one lone prospective juror, Tyrone Binford, who admitted having a conversation with his cousin, a state trooper, at a Halloween party at his church which occurred after jurors had received and returned their questionnaires. In this conversation, Binford's cousin, who had worked with the slain deputies, told him that they were "easy-going friendly guys." N.T. Voir Dire, 12/13/05 MS, at 146.[22] Appellant asserts that all of these factors established that the pretrial publicity was so sustained and pervasive the trial court should have granted him his requested change of venue, and its failure to do so denied him a fair trial.

██ The Commonwealth responds by noting that a change of venue is not warranted unless a defendant demonstrates the existence of pretrial publicity that results in actual prejudice to his ability to select an impartial jury. Appellee's Brief at 16–17 (citing *Commonwealth v. Karenbauer*, 552 Pa. 420, 715 A.2d 1086 (1998)). The Commonwealth acknowledges that our Court has indicated that in instances where pretrial media coverage is "pervasive or inflammatory" prejudice is presumed and a defendant does not have to prove actual prejudice. *Id.* (quoting *Commonwealth v. Bridges*, 563 Pa. 1, 25, 757 A.2d 859, 872 (2000)). However, the Commonwealth disputes Appellant's contention that the pretrial publicity was so widespread and inflammatory that he was not required to prove actual juror prejudice. The Commonwealth notes the trial court found that the pretrial publicity was not of such a degree that the community could be regarded as having been saturated with it. Further, the Commonwealth asserts there was a sufficient cooling off period from the time of the crime to the trial, and the trial court dealt with any potential bias on the part of prospective jurors during the *voir dire* process in which it inquired of all of them as to what knowledge they had of the murders gained from media sources. The Commonwealth points out that only jurors who had declared that their

22. Binford also testified, however, that he would be able to put aside anything he had heard about the case and could judge it based solely on what he heard in the courtroom at trial. N.T. Voir Dire, 12/13/05 MS, at 136, 154. He was ultimately excused from service by Appellant's exercise of a peremptory challenge.

judgment would be unaffected by the media coverage were seated. The Commonwealth contends "the process here plainly satisfied constitutional requirements." Appellee's Brief at 21.

A trial court's decision on a defendant's motion for a change of trial venue based on the claimed existence of pretrial publicity prejudicial to his or her right to trial before an impartial jury is one vested within its sound discretion, and a trial court's decision to deny such a motion will not be overturned by this Court on appeal, unless the record evidences that the trial court has abused its discretion in making its ruling. *Commonwealth v. Weiss,* 565 Pa. 504, 514, 776 A.2d 958, 964 (2001). We have recognized that "the trial court is in the best position to assess the atmosphere of the community and to judge the necessity of any requested change." *Commonwealth v. Tharp,* 574 Pa. 202, 219, 830 A.2d 519, 529 (2003). In reviewing the trial court decision not to grant a change of venue the focus of our inquiry is to determine whether any juror formed a fixed opinion of the defendant's guilt or innocence due to the pretrial publicity. *Commonwealth v. Drumheller,* 570 Pa. 117, 132, 808 A.2d 893, 902 (2002).

A change in venue is compelled whenever a trial court concludes a fair and impartial jury cannot be selected from the residents of the county where the crime occurred. *Weiss,* at 514–15, 776 A.2d at 964. As a general rule, for a defendant to be entitled to a change of venue because of pretrial publicity, he or she must show that the publicity caused actual prejudice by preventing the empanelling of an impartial jury. *Commonwealth v. Robinson,* 581 Pa. 154, 195, 864 A.2d 460, 484 (2004) (quoting *Drumheller,* 570 Pa. at 132, 808 A.2d at 902); *Karenbauer,* 552 Pa. at 434, 715 A.2d at 1092. The mere existence of pretrial publicity alone, however, does not constitute actual prejudice. Simply because prospective jurors may have heard about a case through media reports does not render them incapable of jury service, since, in today's "information age," where news of community events

are disseminated virtually instantaneously by an ever multiplying array of delivery methods, it would be difficult to find 12 jurors who do not at least have some knowledge of the facts of an important and tragic incident like this one. Indeed, almost half a century ago, when the significant impact on people's awareness of events caused by forms of mass media such as television was just beginning to be realized, the United States Supreme Court recognized that securing a defendant's due process right to a fair trial did not require a trial court to seat a jury whose members were completely oblivious of the facts of the crime as they were reported by news sources. Thus, the high Court made clear that an individual's eligibility for jury service could not be conditioned on his or her maintenance of a hermetic state of unawareness of community and world events, reasoning:

> It is not required, however, that the jurors be totally ignorant of the facts and issues involved. In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.

*Irvin v. Dowd,* 366 U.S. 717, 722–23, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). Consequently, the pivotal question in determining whether an impartial jury may be selected is not whether prospective jurors have knowledge of the crime being tried, or have even formed an initial opinion based on the news coverage they had been exposed to, but, rather, whether it is possible for those jurors to set aside their impressions or preliminary opinions and render a verdict solely based on the evidence presented to them at trial. *Commonwealth v. Tres-*

*sler,* 526 Pa. 139, 145 n. 6, 584 A.2d 930, 933 n. 6 (1990); *Commonwealth v. Hoss,* 469 Pa. 195, 200–01, 364 A.2d 1335, 1338 (1976).

Nevertheless, our Court has recognized that there are some instances in which pretrial publicity can be so pervasive and inflammatory a defendant does not have to prove actual prejudice. *Robinson,* 581 Pa. at 195, 864 A.2d at 484. Prejudice will be presumed whenever a defendant demonstrates that the pretrial publicity: "(1) was sensational, inflammatory, and slanted toward conviction, rather than factual and objective; (2) revealed the defendant's prior criminal record, if any, or referred to confessions, admissions or reenactments of the crime by the defendant; or (3) derived from official police or prosecutorial reports." *Tharp,* 574 Pa. at 219, 830 A.2d at 529; *Karenbauer,* 552 Pa. at 434, 715 A.2d at 1092. However, if the defendant proves the existence of one or more of these circumstances, a change of venue will still not be compelled unless the defendant also demonstrates that the presumptively prejudicial pretrial publicity "was so extensive, sustained, and pervasive that the community must be deemed to have been saturated with it, and that there was insufficient time between the publicity and the trial for any prejudice to have dissipated." *Tharp,* 574 Pa. at 219, 830 A.2d at 529. With respect to the determination of whether there has been an adequate "cooling off" period to dissipate the effect of presumptively prejudicial media coverage to ensure that a defendant's due process right to a fair trial has been protected:

> [A] court must investigate what a panel of prospective jurors has said about its exposure to the publicity in question. This is one indication of whether the cooling period has been sufficient. Thus, in determining the efficacy of the cooling period, a court will consider the direct effects of publicity, something a defendant need not allege or prove. Although it is conceivable that pretrial publicity could be so extremely damaging that a court might order a change of venue no matter what the prospective jurors said about their ability to hear the case fairly and without bias, that

would be a most unusual case. Normally, what prospective jurors tell us about their ability to be impartial will be a reliable guide to whether the publicity is still so fresh in their minds that it has removed their ability to be objective. The discretion of the trial judge is given wide latitude in this area.

*Robinson,* 581 Pa. at 195–96, 864 A.2d at 484 (quoting *Drumheller,* 570 Pa. at 133, 808 A.2d at 902–03).[23]

Our review of the record reflects at least some support for Appellant's assertion that both his statement made in jail and the existence of his prior criminal record, were part of the media coverage of this matter, as demonstrated by the statements of several prospective jurors during *voir dire.* In individual *voir dire,* two of the prospective jurors specifically mentioned hearing about Appellant's inculpatory statement in the jail through news reports. N.T. Voir Dire, 12/7/05 AS, at 142; 12/12/05 MS, at 17. Likewise, two prospective jurors told of hearing of Appellant's prior "trouble" with the law in which he had been arrested and convicted of some crimes, and a third juror admitted knowledge that Appellant "had a run-in with the law before, in New York and Pennsylvania," N.T. Voir Dire, 12/7/05 AS, at 138, 12/13/05 MS, at 149, 12/8/05 AS, at 89–90.[24]

■ Thus, we will assume, *arguendo,* that there were, in fact, media accounts which, as Appellant suggested, referenced his making of an inculpatory statement as well as the existence of his prior criminal record. Such accounts are presumptively prejudicial. *Tharp, Karenbauer, supra.* However, our complete review of the record reflects that the trial court took great care to establish whether this news coverage

23. This is not to suggest that a defendant is precluded from presenting in support of a change of venue motion other relevant evidence of the prejudicial impact of media coverage on the community such as opinion polling, a practice utilized in *Cohen, supra* where the polling results were used in conjunction with results of the individual *voir dire* to show that a majority of the people in the community from which the trial jury was selected had irrevocably prejudged the case.

24. None of these individuals were selected to serve as regular or alternate jurors.

deprived Appellant of the ability to seat an impartial jury comprised of Bradford County residents. In making this determination, the trial court did not rely solely on the written answers the jurors had given in their questionnaires, nor did the court accept the opposing representations and interpretations of those written answers offered by Appellant's attorney and the prosecutor. Instead, the trial court conducted a painstaking and searching *voir dire* of the remaining pool of prospective jurors who were not excused by consent or for other reasons such as hardship. During this process, the trial court assiduously sought to ascertain whether any of the prospective jurors had formed a fixed and unalterable opinion about Appellant's guilt, and whether the prospective jurors could, in fact, follow its instructions on Appellant's presumption of innocence, the Commonwealth's burden of proof and, most importantly, its admonition that guilt or innocence must be based solely on the evidence presented at trial. This action was eminently in accord with our Court's previous recognition and endorsement of the principle that "[t]he *voir dire* examination is the proper place to determine whether a defendant's public notoriety has resulted in a prospective juror's prejudice." *Commonwealth v. Casper*, 481 Pa. 143, 162, 392 A.2d 287, 297 (1978); *see also Commonwealth v. Bachert*, 499 Pa. 398, 410, 453 A.2d 931, 937 (1982) ("After the *voir dire* a judge can determine which description of the publicity's impact is accurate; before the *voir dire* a judge could only have guessed.") Further, in conducting the *voir dire*, the trial court allowed Appellant considerable latitude in questioning all of the potential jurors in order to disclose any potential bias they may have possessed, or whether they had prejudged the case based on media reports to which they had been exposed.

The trial court concluded that there had been a sufficient cooling off period after the time of the most extensive media coverage of the manhunt, preliminary hearing, and the funerals for the deputies. The Court deemed the news reporting which occurred after those events as "clearly not pervasive, sustained or prejudicial," observing that just prior to jury selection it had "diminished to the point of no coverage."

Trial Court Opinion, 7/6/07, at 3 n. 1, 4. The trial court found that the jurors' responses during *voir dire* reflected the lack of any extensive, continuing influence of media attention to the case on the community, noting: "An examination of the jury panel took place during the *voir dire* process and the publicity was not found to be fresh in jurors minds.... The few who were unable to decide the case based upon the evidence were appropriately removed." *Id.* at 4–5.

Our comprehensive assessment of the substantial 16 volume, 2,377 page record of the *voir dire,* which took place one year and nine months after the shooting of the deputies, indicates ample support for the trial court's conclusion. Although 64 of the 138 prospective jurors questioned by counsel and the trial court admitted to having gained some knowledge of the case through media reports—i.e., reading about the case in the newspaper or watching it on television—the majority of those, 39 of the 64, indicated that the coverage they recalled seeing was that which occurred nearest in time to the shooting of the deputies, i.e., the coverage of the incident and the hunt for the perpetrator. Only 25 had followed the media coverage of the case throughout, and 22 of those 25 had formed no fixed opinion of guilt as a result of the coverage. Ultimately, of the 138 prospective jurors examined during *voir dire,* only 17, or 12 percent, stated that they had a fixed, unalterable opinion of Appellant's guilt. Because this was not an inordinately high percentage, and all jurors possessing such a fixed opinion were rightfully excused for cause, we find no merit to Appellant's claim that his right to an impartial jury was compromised by the selection of the final jury from this group. *See Tharp, supra* (holding no change of venue required when 30 of 100 prospective jurors (30%) questioned in voir dire had a fixed unchangeable opinion of guilt and were excused for cause); *Commonwealth v. Stoltzfus,* 462 Pa. 43, 54, 337 A.2d 873 (1975) (holding no change of venue necessary when 31 of 139 (22%) of prospective jurors formed opinion of defendant's guilt); *Hoss, supra,* 445 Pa. at 108, 283 A.2d at 64 (holding change of venue not compelled where 26 of 138 (19%) of prospective jurors

expressed their belief in defendant's guilt of the crime charged).

We note also that of the 12 jurors who were finally selected to serve, 4 did not read anything at all about the case or hear any reports about it on radio and television. Six others either read or heard news reports about the case in the immediate aftermath of the shooting while the intense police manhunt was underway, but they did not follow media coverage of the case thereafter. One of these 6 had even forgotten completely about the case by the time he was summoned as a juror. Only 2 had continued to intermittently follow news accounts of the case from the time Appellant was captured until the time they were summoned as potential jurors. Most critically, none of these 8 trial jurors who were exposed to media coverage indicated their exposure had caused them to form fixed, unchanging opinions of the Appellant's guilt, or that it would interfere in any way with their ability to render a verdict based solely on the evidence presented in court.

The lack of substantial numbers of jurors professing fixed opinions of Appellant's guilt during *voir dire*, and evident diminution in media coverage over the period of time from Appellant's arrest until jury selection began, stands in stark contrast to the factual circumstances which existed in *Cohen, supra*. In that case, opinion polling conducted in the community by the defendant demonstrated the numbers of people who had prejudged him guilty was increasing as the time of trial approached, and a substantial majority of those polled before jury selection began, 57%, indicated their belief in the defendant's guilt.[25] The individual *voir dire* of the prospective jurors confirmed the polling results—showing that a clear majority of all jurors examined during this process, 53%, had to be excused because of their "fixed, irrevocable opinion" of the defendant's guilt. *Cohen,* 489 Pa. at 186, 413 A.2d at 1076. This increase was due to widespread and continuing newspaper and radio reports mentioning extremely inflammatory

25. An initial poll taken four months after Appellant's arrest placed the percentage of people in the community who had deemed him guilty at 30 percent. *Cohen,* 489 Pa. at 185, 413 A.2d at 1076.

statements the district attorney made to pressure witnesses to testify against the defendant and improper statements which an assistant district attorney made about the nature of the case at a bail hearing. Specifically, during questioning of the defendant's alleged co-conspirators by detectives, the district attorney was present in the interrogation room and told each one that they "would burn" and that they would "have the opportunity to smell burning flesh" if they did not provide investigators with details of the case. *Cohen,* 489 Pa. at 182, 413 A.2d at 1074. The district attorney later told detectives that "he wanted to stand beside Mr. Cohen when they pulled the switch." *Id.* Also, the assistant district attorney handling the prosecution stated at a bail hearing that bail should be denied because this was a contract killing and, also, that the Commonwealth might seek the death penalty "which ... is allowed for premeditated contract killings." *Id.* at 179, 413 A.2d at 1073.

In ruling that a change of venue was necessary under these circumstances, our Court specifically noted that the record established that these prejudicial statements were "repeatedly disseminated" and "widespread" throughout the county at the time of trial and no cooling off period had occurred. *Id.* at 184, 413 A.2d at 1075. Our Court viewed the 53 percent of jurors who were excused for having prejudged the case on the merits as "unprecedented in our cases." *Id.* at 186, 413 A.2d at 1077. Consequently, our Court concluded that the trial court abused its discretion for not granting the change of venue request, since it was evident the defendant's right to trial before an impartial jury had clearly been compromised.

In the case *sub judice,* former District Attorney Downs made no statements in his letter to the attorney general, or otherwise, which equated in egregiousness to those uttered by the district attorney in *Cohen.* Additionally, former District Attorney Downs' letter was written to the attorney general in August of 2004, *see supra* note 18, and the hearing on Appellant's motion to remove the attorney general, at which former District Attorney Downs testified as to matters contained in the letter, was held in early May 2005. Since jury selection in

this case did not begin until December 2005, and, as recounted above, only a small number of jurors expressed awareness during *voir dire* of Appellant's prior criminal record or statements made to the police, the trial court did not abuse its discretion under these circumstances in finding that there was a sufficient "cooling off" period adequate to dilute the prejudicial effects of any publicity resulting from former District Attorney Downs' remarks in the letter or his testimony at the hearing. Most importantly, none of the regular jurors who were ultimately seated, nor any of the alternate jurors selected, expressed any awareness, during *voir dire*, of these statements, and, thus, their judgment of the case could not have been affected by them. All of the jurors seated avowed under oath and penalty of perjury that they could decide the case based solely on the trial evidence, and that they had no preconceived or fixed opinion of Appellant's guilt. Appellant's sacrosanct constitutional right to be tried before a fair and unbiased jury was, therefore, not compromised under these particular circumstances, and we discern no abuse of discretion by the trial court in denying Appellant's motion to change the venue of his trial.

B. *Denial of Appellant's motion to suppress his statement made to Troopers Pelachick, Kerrick and the two prison guards present in a medical treatment room of the Bradford County Jail on the afternoon of April 2, 2002*

Appellant argues the trial court erred in failing to suppress his statement made in the medical treatment room of the Bradford County jail on April 2, 2004. As detailed previously, when Trooper Pelachick had finished talking to Appellant, and he, Trooper Kerrick, and the two prison guards also present started to leave the room, Appellant began to sob and then suddenly blurted out: "I'm sorry, I'm sorry, tell their families I'm sorry, I didn't mean to kill them." N.T. Suppression Hearing, 11/10/04, at 31. Appellant contends the trial court erred in failing to grant his motion to suppress this statement because it was the product of Trooper Pelachick's conversation with him, which he claims violated his right to counsel under

both the Fifth and Sixth Amendments to the United States Constitution.[26]

■ Appellant avers, citing our Court's holding in *Commonwealth v. Mercier*, 451 Pa. 211, 302 A.2d 337 (1973), that once an individual has invoked his right to counsel under the Fifth Amendment to the United States Constitution, *Miranda*[27] requires that all interrogation must cease. Appellant further claims that *Miranda* bars not only interrogation which involves express questioning but also includes "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." Appellant's Brief at 20 (quoting *Commonwealth v. Ramos*, 367 Pa.Super. 84, 532 A.2d 465, 468 (1987), in turn quoting *Rhode Island v. Innis*, 446 U.S. 291, 300, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980)). Appellant further contends that the United States Supreme Court "clarified" that police are not just prohibited from conducting "interrogation," as that term was utilized in *Michigan v. Jackson*, 475 U.S. 625, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986), of an individual who has asserted his or her *Miranda* rights, but, rather, they are also prohibited from initiating other types of contact such as

26. Appellant additionally makes a bare assertion that the trooper's conversation with him violated his right to counsel under the Pennsylvania Constitution which is secured by Article 1, Section 9 of that charter. Appellant's Brief at 22. However, as noted by the Commonwealth, he does not advance any argument, nor cite any caselaw, in support of this claim. It is, therefore, insufficiently developed to permit meaningful appellate review, and, correspondingly, we will restrict our analysis to Appellant's allegation that his rights protected by the Fifth and Sixth Amendments to the United States Constitution were contravened by the trooper's conversation. *See, e.g., Commonwealth v. Allshouse*, 604 Pa. 61, 71, 985 A.2d 847, 852 n. 8 (2009) (refusing to consider issue of whether appellant was entitled to relief under the Pennsylvania Constitution whenever appellant failed to present a specific argument based on the constitutional provision allegedly violated).

27. Very recently, in *Berghuis v. Thompkins*, —— U.S. ——, 130 S.Ct. 2250, 176 L.Ed.2d 1098 (2010), the high Court held that an individual in police custody subject to interrogation must affirmatively invoke his or her *Miranda* rights; thus, mere silence in the face of police questioning after being given *Miranda* warnings is insufficient to invoke *Miranda* rights. It is clear from the record in this matter that Appellant's request to speak with a lawyer was an invocation of his *Miranda* rights.

"further discussions," or "police-initiated conversation," and from "deliberately elicit[ing]" statements. Appellant's Brief at 21 (quoting *Michigan v. Jackson*, 475 U.S. 625, 636, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986), *Smith v. Illinois*, 469 U.S. 91, 95, 105 S.Ct. 490, 83 L.Ed.2d 488 (1984) and *Michigan v. Harvey*, 494 U.S. 344–345, 348–349, 110 S.Ct. 1176, 108 L.Ed.2d 293 (1990)).[28]

Appellant asserts that when the troopers visited him at the jail on April 2, 2004 they did not advise him of his rights. He further maintains that, nevertheless, he clearly invoked his right to counsel by saying that he would like to speak with an attorney before talking with the troopers and, thus, "all police-initiated conversations relating to the case should have ceased." Appellant's Brief at 21. However, according to Appellant, despite his request for counsel, the police officers continued to have a conversation with him, which he asserts was reasonably likely to elicit an incriminating response from him due to their mention of the John Kohler case. Appellant alleges that he only made the incriminating statement after the troopers stated it would be wise for him to speak to them and explain his side of the story and, also, informed him that Kohler ended up being convicted and sentenced to death after he elected not to speak with the police.

In response, the Commonwealth highlights the differences between when the right to counsel under the Fifth Amendment attaches—immediately upon counsel being requested by a person who is in custody during an interrogation—and when the right to the assistance of counsel attaches under the Sixth Amendment—at the initiation of formal judicial proceedings against an individual.[29] The Commonwealth also acknowl-

**28.** The specific holding of the high Court in *Jackson* was "if police initiate interrogation after a defendant's assertion, at an arraignment or similar proceeding, of his right to counsel, any waiver of the defendant's right to counsel for that police-initiated interrogation is invalid." 475 U.S. at 636, 106 S.Ct. 1404.

**29.** Appellant was arraigned on the night of his arrest, prior to being transported to the Bradford County Jail, and, thus, his Sixth Amendment right to counsel attached at that time. *See, e.g., Rothgery v. Gillespie County*, 554 U.S. 191, 213, 128 S.Ct. 2578, 2592, 171 L.Ed.2d

edges the limitations the high Court has placed on police interrogation once an individual's right to counsel attaches under either amendment, noting that police are forbidden from further interrogating a person in custody who requests an attorney until counsel has been made available to him, or he initiates further communications, exchanges, or conversations with the police, and, additionally, that if an individual has asserted his right to counsel at an arraignment or similar proceeding any waiver of that right during subsequent police initiated interrogation is invalid. Commonwealth's Brief at 28 (citing *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981) and *Jackson*, 475 U.S. at 636, 106 S.Ct. 1404).[30] The Commonwealth further notes the relevant standard for determining if a Sixth Amendment violation has occurred set forth by the high Court in the case of *Massiah v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), which expressly barred the use of statements "deliberately elicited" by police from an indicted individual in the absence of counsel.

The Commonwealth contends that the evidence of record demonstrates there was no deliberate elicitation of Appellant's incriminating statement by Trooper Pelachick, nor did he engage in any interrogation of Appellant. In support of this contention, the Commonwealth points to the trial court's reliance on the following factors in ruling that Appellant made a voluntary statement and was not subjected to a custodial

366 (2008) ("[A] criminal defendant's initial appearance before a judicial officer, where he learns the charge against him and his liberty is subject to restriction, marks the start of adversary judicial proceedings that trigger attachment of the Sixth Amendment right to counsel."); *Commonwealth v. Gwynn*, 596 Pa. 398, 410, 943 A.2d 940, 947 (2008) (recognizing that Sixth Amendment right to counsel attaches at the initiation of adversary judicial proceedings which is generally at the arraignment).

30. Recently, the high Court held in *Maryland v. Shatzer*, —— U.S. ——, 130 S.Ct. 1213, 175 L.Ed.2d 1045 (2010), that if an individual terminates a police interrogation by making a request for an attorney, and there is a break of 14 days or more until the next period of "interrogative" or "*Miranda* custody," 130 S.Ct. at 1225, and if the individual is read his *Miranda* rights during the subsequent period of interrogative custody and chooses to waive them, *Edwards* does not preclude the admission into evidence of any statements made thereafter.

interrogation: 1) the purpose of the troopers' visit to the jail was to inform Appellant that Attorney Agnellino would not be representing him and to ask him if he wanted a different attorney; 2) the troopers never discussed the facts of the case with Appellant or made any mention of the deputies' murder to Appellant; 3) the troopers never questioned Appellant except to ask him how he wished to go about obtaining a lawyer; 4) Appellant's inculpatory statement was not made in response to a question or comment of the troopers; and 5) Appellant's inculpatory statement was made once the troopers finished asking him if he wanted another lawyer and as they were leaving the infirmary. Commonwealth's Brief at 29; Trial Court Opinion, 7/10/07, at 11. All of these factors, the Commonwealth maintains, establish that Appellant's statement was voluntary, unsolicited, and freely made.

We begin our analysis by stating our Court's well settled standard of review of a suppression ruling. Our review is limited to determining whether the record supports the findings of fact of the suppression court and whether the legal conclusions drawn from those findings are correct. *Commonwealth v. Mistler*, 590 Pa. 390, 396, 912 A.2d 1265, 1268 (2006). When it is the defendant who appeals an adverse suppression ruling, we may consider only the evidence presented for the Commonwealth and that of the defense which remains uncontradicted when fairly read in the context of the entire record. *Commonwealth v. Pruitt*, 597 Pa. 307, 325, 951 A.2d 307, 317 (2008). We are bound by the factual findings of the suppression court, which are supported by the record, but we are not bound by the suppression court's legal rulings, which we review *de novo*. *Commonwealth v. Snyder*, 599 Pa. 656, 664, 963 A.2d 396, 400 (2009).

Guided by these standards, we first address Appellant's claim that his right to the assistance of counsel under the Fifth Amendment to the United States Constitution was violated by the troopers' conversation with him prior to his incriminatory declaration. The question of what specific type of police conduct constitutes prohibited "interrogation" after an individual in police custody has requested the assistance of

counsel was addressed by the high Court in *Innis, supra.* In that case, the defendant, Innis, was arrested for committing an armed robbery and murder of a taxi driver with a sawed off shotgun. After being read his *Miranda* rights, Innis indicated he wanted to speak with a lawyer. He was then placed into the back of a police vehicle for transport by three police officers to the central police station. The officers' superior instructed them not to "question [Innis] or intimidate or coerce him in any way." *Innis,* 446 U.S. at 294, 100 S.Ct. 1682.

During the trip to the station, two of the officers in the front seat began talking with each other and observed that the area in which the robbery had taken place was near a school for handicapped children who frequently played outside. Both of the officers expressed their concern over the prospect of one of the children finding a loaded gun, and one stated aloud how bad it would be if a little girl picked up the gun and killed herself. Upon hearing this conversation, the defendant requested the officers turn the vehicle around so that he could show them where the gun was. The gun was subsequently recovered and admitted at evidence in Innis' trial.

Innis appealed his conviction to the Rhode Island Supreme Court which vacated his conviction—ruling that he had been improperly interrogated in contravention of *Miranda.* The Rhode Island Supreme Court viewed the police officers' conversation between themselves to be an exercise in "subtle coercion" of Innis which it regarded as "the equivalent of 'interrogation.'" *Innis,* 446 U.S. at 296, 100 S.Ct. 1682. The high Court granted *certiorari* to "address for the first time the meaning of 'interrogation' under *Miranda....*" *Id.* at 297, 100 S.Ct. 1682.

To formulate a definition of interrogation the Court first examined *Miranda,* and noted its language that referred to custodial interrogation as "questioning initiated by law enforcement officers after a person has been taken into custody." *Id.* at 298, 100 S.Ct. 1682 (quoting *Miranda,* 384 U.S. at 444, 86 S.Ct. 1602). Although acknowledging that this language could be read as limiting the definition of interrogation to just

police questioning, the Court declined to impose such a restrictive construction. Instead, the Court reemphasized its primary reason for adopting the *Miranda* safeguards—its concern that "the 'interrogation environment' created by the interplay of interrogation and custody would 'subjugate the individual to the will of his examiner' and thereby undermine the privilege against compulsory self-incrimination." *Id.* at 299, 100 S.Ct. 1682 (quoting *Miranda,* 384 U.S. at 457–58, 86 S.Ct. 1602). The Court recounted the variety of methods used by some interrogators to elicit a confession such as coaching witnesses to pick the defendant out of a lineup, and myriad psychological interrogation ploys including blaming the victim and minimizing the seriousness of the offense. The Court observed that though none of these "techniques of persuasion" involved express questioning, they were, nevertheless, thought to amount to interrogation.

The Court next reminded that the *Miranda* safeguards are applicable only in situations where an individual has been taken into custody **and** interrogated; thus, it reasoned that interrogation, as that term was utilized in *Miranda,* "must reflect a measure of compulsion above and beyond that inherent in custody itself." *Id.* at 300, 100 S.Ct. 1682. Accordingly, the Court concluded that *"Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent," *Id.,* and it adopted the following definition of police interrogation to which the *Miranda* safeguards apply:

[T]he term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response [5] from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. This focus reflects the fact that the *Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the

underlying intent of the police. A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation.[7] But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response.[8]

[5] By 'incriminating response' we refer to any response-whether inculpatory or exculpatory-that the *prosecution* may seek to introduce at trial.

\* \* \*

[7] This is not to say that the intent of the police is irrelevant, for it may well have a bearing on whether the police should have known that their words or actions were reasonably likely to evoke an incriminating response. In particular, where a police practice is designed to elicit an incriminating response from the accused, it is unlikely that the practice will not also be one which the police should have known was reasonably likely to have that effect.

[8] Any knowledge the police may have had concerning the unusual susceptibility of a defendant to a particular form of persuasion might be an important factor in determining whether the police should have known that their words or actions were reasonably likely to elicit an incriminating response from the suspect.

*Innis*, 446 U.S. at 301–302, 100 S.Ct. 1682 (emphasis original) (footnote 6 omitted).

Applying this standard to the officers' conversation overheard by Innis, the Court concluded that it did not constitute interrogation. The Court noted that Innis was not subjected to express questioning, nor did it appear from the record that the officers should have known that their conversation was reasonably likely to elicit an incriminating response, as there was no evidence of record to suggest he was "peculiarly susceptible to an appeal to his conscience concerning the safety of handicapped children," or "unusually disoriented or upset." *Id.* at 303, 100 S.Ct. 1682. Likewise, the Court found the record did not support the conclusion that the officers had designed the remarks to cause Innis to respond. The Court agreed that Innis was subjected to subtle compulsion through the officers' comments; however, the Court made clear this

was not enough by itself to establish that a suspect has been interrogated. Instead, the Court reiterated: "It must also be established that a suspect's incriminating response was the product of words or action on the part of the police that they should have known were reasonably likely to elicit an incriminating response." *Id.*[31]

It is clear from the testimony at the suppression hearing in the present case that Trooper Pelachick did not ask Appellant any questions whatsoever regarding the death of the deputies during his conversation with Appellant in the Bradford County jail infirmary; hence, under *Innis*, we must further determine if Trooper Pelachick's conversation with Appellant constituted "the functional equivalent of an interrogation," i.e., whether he should have known that his conversation with Appellant was reasonably likely to produce an incriminating response. In making this determination *Innis* requires that, we, as a reviewing court, examine the totality of the circumstances surrounding the police interaction with an individual in custody and "focus on [the individual's] perceptions and give relevance to the officer's constructive knowledge." *Commonwealth v. Gaul,* 590 Pa. 175, 181, 912 A.2d 252, 255 (2006) (citing *Commonwealth v. DeJesus,* 567 Pa. 415, 429, 787 A.2d 394, 402 (2001)). A relevant factor considered in this objective inquiry is whether the police remarks to the person in custody were "designed to elicit an incriminating

---

31. Contrary to Appellant's assertion, the high Court did not, in the cases of *Smith v. Illinois,* 469 U.S. 91, 105 S.Ct. 490, 83 L.Ed.2d 488 (1984) and *Michigan v. Harvey,* 494 U.S. 344, 110 S.Ct. 1176, 108 L.Ed.2d 293 (1990), expand its category of prohibited police interactions with individuals in custody who have asserted their *Miranda* rights to include "conversations" or "discussions" which do not constitute interrogation. In neither case did the high Court retreat from its holding in *Innis* that it is only words or actions by the police that are reasonably likely to elicit an incriminating response that are prohibited in such situations. The Court continues to utilize the *Innis* "reasonably likely to elicit an incriminating response" test to determine whether statements of the police to an individual in custody may be considered interrogation. *See, e.g., Pennsylvania v. Muniz,* 496 U.S. 582, 601, 110 S.Ct. 2638, 110 L.Ed.2d 528 (1990) (applying *Innis* to determine whether biographical questions asked of individual who was arrested for DUI constituted custodial interrogation).

response." *Innis*, 446 U.S. at 301 n. 7, and 303 n. 9, 100 S.Ct. 1682.

When all of the circumstances surrounding Trooper Pelachick's conversation with Appellant are considered they do not establish that Trooper Pelachick should have known that his discussion was reasonably likely to have produced an incriminating response from Appellant. During his conversation with Appellant, Trooper Pelachick mentioned nothing about the death of the deputies, nor did he discuss other aspects of the case such as the status of the investigation, or other evidence that had been collected. To the contrary, the focus of Trooper Pelachick's discussion with Appellant was to apprise him of the status of his request for Attorney Agnellino's assistance, which he had made the evening before at the barracks, and to attempt to ascertain Appellant's wishes about whether he wanted the services of another attorney. This was not an improper subject of conversation since Appellant had specifically indicated his desire to speak with the troopers once he had obtained an attorney, and, thus, the troopers were attempting to facilitate the process of his retention of counsel through their talk with him at the jail. After Appellant said he wanted the services of the public defender, the troopers properly stated to him that they would not be able to speak with him about the case and indicated they would talk to him later with his attorney. It was in this context, i.e., the prospect of a future conversation with Appellant **once he had retained counsel,** that Trooper Pelachick made his off-hand reference to the Kohler case. *See supra* at 451, 12 A.3d at 304. Thus, this reference cannot, under these circumstances, be construed as an attempt by Trooper Pelachick to overcome Appellant's will and induce him to speak about the case without the assistance of counsel. The record simply does not reflect that Trooper Pelachick designed his statement to Appellant with the purposes of eliciting an incriminating response from him.

Further, Appellant did not make his declaration in immediate response to Trooper Pelachick's isolated statement about the Kohler case, which Trooper Pelachick did not elaborate further upon during the remainder of their discussion. As the

Commonwealth has noted, Appellant exhibited no visible reaction to Trooper Pelachick's statement. Appellant's immediate response to Trooper Pelachick was to matter of factly state: "I know the deal, I've been through this before." N.T. Suppression Hearing, 11/10/04, at 29. Thus, it seems plain that Appellant felt no compulsion to waive his right to an attorney and speak to the troopers about the case as the result of Trooper Pelachick's comment. Only after Trooper Pelachick's conversation with Appellant was concluded did he then make his exclamation. For all of these reasons, we conclude that Appellant was not subjected to the "functional equivalent of an interrogation" and, consequently, his Fifth Amendment right to the assistance of counsel was not violated. Appellant's statement was a volunteered and spontaneous utterance, which the trial court properly deemed admissible as evidence against Appellant. *See Commonwealth v. Fisher,* 564 Pa. 505, 520, 769 A.2d 1116, 1125 (2001) (holding that unsolicited remarks which were not the result of custodial interrogation are considered "spontaneous, voluntary statements not subject to suppression"); *Commonwealth v. Whitley,* 500 Pa. 442, 444, 457 A.2d 507, 508 (1983) (holding that statement by defendant that "I didn't mean to shoot the fellow, it was all a mistake" was not the result of improper police interrogation since it was volunteered and not the product of police questioning or other "compelling influence").

▮▮ Turning to Appellant's assertion of a violation of his Sixth Amendment right to the assistance of counsel, we note the high Court has underscored that the legal standard for assessment of this claim is different from that governing the assessment of whether a Fifth Amendment violation has occurred. *Fellers v. United States,* 540 U.S. 519, 524, 124 S.Ct. 1019, 157 L.Ed.2d 1016 (2004). Once the Sixth Amendment right to counsel has attached for an individual, which, as discussed *supra,* is "at or after the time that judicial proceedings have been initiated against him whether by way of formal charge, preliminary hearing, indictment, information, or arraignment," *Brewer v. Williams,* 430 U.S. 387, 398, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977) (internal quotation marks omit-

ted), any statement made by the individual, thereafter, which is "deliberately elicited" by police, without him or her making a valid waiver of the right to counsel,[32] is deemed a contravention of this right. *Fellers*, 540 U.S. at 523, 124 S.Ct. 1019 (quoting *Massiah v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964)). The Court has emphasized that "deliberate elicitation" is not just limited to police conduct which constitutes interrogation, but, rather, will be found in every instance where the police "deliberately and designedly set out to elicit information from [an individual]." *Brewer*, 430 U.S. at 399, 97 S.Ct. 1232.

██ A review of the entirety of the circumstances regarding the conversation between Trooper Pelachick and Appellant, discussed above, does not indicate that Trooper Pelachick engaged in any conduct designed to deliberately elicit an incriminating statement from Appellant. To the contrary, the suppression record evinces that Trooper Pelachick's action of having a conversation with Appellant was undertaken with the intent to procure counsel for Appellant, pursuant to his express wishes. Although Appellant had invoked his right to counsel under the Sixth Amendment by his request for counsel after he had been arraigned, the record is devoid of evidence that Trooper Pelachick deliberately utilized any methods designed to improperly induce him to make a statement in the absence of counsel, such as making emotional appeals to conscience, discussing the facts of the case with him, or confronting him with evidence calculated to provoke a response such as statements of other individuals. *Cf. Commonwealth v. Cornelius*, 856 A.2d 62 (Pa.Super.2004) (tour of area of crime scene with defendant after he had invoked his Sixth Amendment right to counsel was attempt to deliberately elicit an incriminating statement). Neither is there any evidence that Trooper Pelachick exploited any known susceptibility of Appellant, based on his background, mental state, or

**32.** *See Patterson v. Illinois*, 487 U.S. 285, 108 S.Ct. 2389, 101 L.Ed.2d 261 (1988) (holding that a valid waiver of the Sixth Amendment right to counsel may be made by an individual if he or she has not previously expressed a desire for the assistance of counsel in dealing with the police).

moral beliefs in order to induce him to talk about the case. *Cf. Brewer, supra,* (holding that police discussion with defendant which mentioned the desirability of finding a murdered girl's body so that it could be given a "Christian burial" violated the defendant's Sixth Amendment right to counsel since the police acted with specific intent to exploit the defendant's mental state since they knew he was recently released from a mental hospital, and had deeply held religious convictions). Because the record does not support the conclusion that Trooper Pelachick "deliberately and designedly" provoked Appellant's spontaneous declaration, there was no violation of the Sixth Amendment right to counsel in this instance. As the United States Supreme Court has aptly noted in this regard, "the Sixth Amendment is not violated whenever—by luck or happenstance-the State obtains incriminating statements from the accused after the right to counsel has attached." *Maine v. Moulton,* 474 U.S. 159, 176, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985).

### C. Denial of Appellant's motion for physical testing of pieces of evidence

 Appellant next contends that the trial court erred in denying his motion requesting, *inter alia,* the trial court's permission to have a ballistics expert examine one of the bullets found with the gun under the rock on July 7, 2004. Appellant's Fifth Supplemental Pretrial Motion, filed 8/22/2005, at ¶ 4A. The trial court scheduled a hearing on this motion for October 7, 2005, during which Appellant, through counsel, made an oral request that the clothing and shoes the deputies were wearing, as well as the shoes worn by Appellant and his girlfriend, Duva, be "forwarded to R.J. Lee Group, Monroeville for examination." N.T. Hearing, 10/7/05, at 2. The Commonwealth responded by requesting the defense make an offer as to why the requested testing was material to his defense. Appellant refused, stating:

> Your Honor, we believe that under Rule 572(b) [sic] subsection (1)(f), that we're permitted to examine any tangible evidence. It's a mandatory discovery. And that's our

position. We—we have discussed whether it is our burden to come forth and to tell you in open court before the Commonwealth as to the reason behind that. I will tell you that it is Mr. Lepley and my opinion that to do that would divulge our theory of the case, and that we do not believe that that's in the interest of our defendant to do that. And at this point in time, our request is—as you know, the one in—regarding Mr. Wently looking at the cartridges and taking 'em apart. The other one is to have these items forwarded to the R.J. Lee group for examination. That's our offer. We believe that we're entitled to do that under the applicable discovery rules.

*Id.* at 4–5. The trial court denied the motion.

Presently, Appellant, principally citing Pa. R.Crim.P. 573(B)(1)(f),[33] asserts that the trial court erred by denying him the right to examine these clothing items and the bullet.[34] We review a trial court's decision to deny a discovery request pursuant to this rule under an abuse of discretion standard. *Commonwealth v. Ogrod*, 576 Pa. 412, 461, 839 A.2d 294, 323 (2003). Unless an appellant demonstrates how he was prejudiced by the decision to deny discovery he cannot

**33.** This Rule provides:

**(B) Disclosure by the Commonwealth.**

(1) *Mandatory.* In all court cases, on request by the defendant, and subject to any protective order which the Commonwealth might obtain under this rule, the Commonwealth shall disclose to the defendant's attorney all of the following requested items or information, provided they are material to the instant case. The Commonwealth shall, when applicable, permit the defendant's attorney to inspect and copy or photograph such items.

\* \* \*

(f) any tangible objects, including documents, photographs, fingerprints, or other tangible evidence;

Pa.R.Crim.P. Rule 573(B)(1)(f).

**34.** Appellant also generally asserts a violation of his right to due process under the Fifth Amendment to the United States Constitution and Article 1, Section 9 of the Pennsylvania Constitution, and, also, cites to *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) for the broad proposition that materially exculpatory evidence must be turned over to the defense. As the Commonwealth has suggested, this claim is undeveloped and, hence, waived. *LaCava, supra.*

show an abuse of discretion. *Id.* As noted above, Appellant refused at the hearing to offer a reason why the specific testing he requested was necessary to his defense. Further, even after the trial court indicated at the hearing that it would be denying the motion, Appellant's counsel reiterated his refusal to make an offer of proof regarding the reason for the request, stating he would not be calling his firearm expert to testify what he would be doing with the items. Additionally, he admitted to not having anyone from the R.J. Lee Group present to testify and explain what testing that organization would be conducting. N.T. Hearing, 10/7/05, at 6–7. Under these circumstances, the trial court denied the motion for testing, citing this failure to lay a proper foundation for the discovery request, and its concern for the potential destruction of evidence, i.e., "the 'breaking down' of cartridges." Trial Court Opinion, 10/12/05, at 5. According to the trial court, it had, in fact, previously granted permission for Appellant to conduct tests on the evidence which could possibly consume the evidence, provided that a representative of the Commonwealth was present for oversight. Trial Court Opinion, 7/6/07, at 5. Appellant presented no rationale at the hearing as to why this requirement could not be met during the conduct of the testing he requested.

Appellant contends that he was "severely prejudiced by the trial court's decision and unable to prepare an adequate defense." Appellant's Brief at 24. In support of this contention, he now avers, baldly and for the first time, without citation to support in the record: "As testified to by the Commonwealth's experts, the testing completed by Skip Schwoebel could have been used to determine if Appellant was in an area where a firearm was discharged. If the test proved negative, then Appellant could have arguably been ruled out as the shooter." *Id.* However, Appellant did not present this argument to the trial court in support of his request for testing, nor did he proffer any other rationale beyond his bare claim of entitlement to testing under Pa.R.Crim.P. 573. While Appellant was not obligated to divulge his entire theory of the case in order to obtain the requested testing, he was, never-

theless, under the plain language of Pa.R.Crim.P. 573(B)(1), required to present some plausible reason to the trial court as to why the testing would be material to his defense.[35] *See id.* ("[T]he Commonwealth shall disclose to the defendant's attorney all of the following requested items [including any tangible objects or other tangible evidence] provided they are **material** to the instant case. The Commonwealth shall, **when applicable,** permit the defendant's attorney to inspect ... such items." (emphasis supplied)). Further, since the testing would have, by Appellant's own admission, resulted in physical alteration and potential destruction of the evidence, he also needed to offer reasons why he could not comply with the terms of the trial court's protective decree, authorized by this rule, that a representative of the Commonwealth be present during such testing. Because Appellant failed to make such offers of proof to the trial court, his current claim of trial court error in denying his request is waived under Pa.R.A.P. 302(a) for purposes of this direct appeal.

*D. Denial of Appellant's motion to strike the attorney general's assumption of the prosecution at the request of the District Attorney of Bradford County*

■ Appellant next contends that the attorney general's assumption of the prosecution of his case was not authorized by 71 P.S. § 732–205(a)(3) of the Commonwealth's Attorney's Act which provides:

**§ 732–205. Criminal prosecutions**

(a) **Prosecutions.**—The Attorney General shall have the power to prosecute in any county criminal court the following cases:

\* \* \*

(3) Upon the request of a district attorney who lacks the resources to conduct an adequate investigation or the prosecution of the criminal case or matter or who represents that there is the potential for an actual or apparent

---

**35.** "The Rules of Criminal Procedure are to ... be interpreted in accordance with the plain meaning of their terms." *Commonwealth v. Pressley,* 584 Pa. 624, 630 n. 5, 887 A.2d 220, 223 n. 5 (2005).

conflict of interest on the part of the district attorney or
his office.

\* \* \*

71 P.S. § 732–205(a)(3). In his letter to the attorney general,
former District Attorney Downs averred he was requesting
the attorney general conduct the prosecution under this stat-
ute due to both inadequate resources and an actual or appar-
ent conflict of interest on his part. Trial Court Opinion,
5/27/2005, at 3 (quoting Downs Letter, at 1).

As noted, *supra*, Appellant filed a pretrial motion to remove
the attorney general asserting that the attorney general
lacked authority to prosecute the case under 71 P.S. § 732–
205(a)(3), and the trial court conducted a hearing on this
motion on May 9, 2005 at which former District Attorney
Downs testified. To justify his intervention, the attorney
general relied on this testimony, as well as the matters
expressed in former District Attorney Downs' letter to the
attorney general, which Downs reaffirmed in their entirety at
the hearing as correct factual representations, and an accurate
accounting of his personal feelings as they existed at the time
the letter was sent.

The trial court ruled that the attorney general's assumption
of the prosecution was proper under 71 P.S. § 732–205(a)(3)
and expressly found that, with the exception of his claim that
his inappropriate anger at the Sheriff created a conflict of
interest, all of former District Attorney Downs' other asser-
tions in his letter to the Office of the Attorney General—that
he had inadequate resources to prosecute the case, and a
potential conflict of interest—were "credible and valid." Trial
Court Opinion, 5/27/2005, at 10. Appellant principally focuses
his present challenge on these twin findings of the trial
court—claiming that the evidence does not support by a
preponderance of the evidence the attorney general's involve-
ment in this case.[36]

36. Appellant additionally claims that former District Attorney Downs
was not permitted to seek intervention of the attorney general based on
his testimony at the hearing "that the Pennsylvania State Police needed
assistance in its investigation." Appellant's Brief at 26. Since the trial

It is now firmly established in this Commonwealth that "the powers of the attorney general are strictly limited and are solely a 'matter of legislative designation and enumeration.' " *Commonwealth v. Mulholland*, 549 Pa. 634, 655, 702 A.2d 1027, 1037 (1997). Thus, "the attorney general may intervene in criminal prosecutions only in accordance with provisions enumerated by the legislature." *Id.* Since the attorney general's intervention in this case was based on 71 P.S. § 732–205, under the plain language of this statutory provision a request for the attorney general to conduct the prosecution "must flow from either a lack of resources, either to investigate or prosecute, or a potential conflict of interest." *Commonwealth v. Khorey*, 521 Pa. 1, 19, 555 A.2d 100, 109 (1989). As we further opined in *Khorey*, when an appellate court reviews the findings of fact of a trial court regarding whether these statutory requirements have been met, it "should not lightly reverse" those findings. 521 Pa. at 20, 555 A.2d at 110. Thus, we will only overturn a trial court's decision finding the attorney general's intervention proper under this section if it has abused its discretion. *Id.*

At the hearing on Appellant's motion, former District Attorney Downs testified that though he was a part-time district attorney, and paid as such, he always worked as a full-time district attorney and did not have an outside legal practice. N.T. Hearing, 5/9/05, at 22. At the time of the hearing, his entire staff consisted of two full-time assistants and one part-time assistant who solely handled juvenile cases, in addition to

court did not rest its decision on these grounds, we express no comment on this argument. Appellant also asserts the trial court erred by finding that the attorney general should be the "primary gatekeeper" of the prosecution and thereby impermissibly expanded the jurisdiction of the attorney general. Appellant's Brief at 29 (quoting Trial Court Opinion, 5/27/2005, at 10). This claim is without merit as a fair reading of the trial court's opinion indicates it did not consider the attorney general to have a general jurisdictional gatekeeping function enabling it to intervene in every criminal case and assume prosecution; rather, the trial court was simply recognizing that the attorney general was a "gatekeeper" insofar as being responsible for deciding whether he would exercise his power to prosecute a case under 71 P.S. § 732–205 once a request for intervention has been made by a district attorney.

one county detective, two secretaries, a file clerk, and a victim witness coordinator. *Id.* Former District Attorney Downs and his two assistants were responsible for handling an overall criminal caseload of 1,500 cases per year, an amount the trial judge, a seasoned jurist, deemed "considerable" for a 6th class county with two judges. Trial Court Opinion, 5/27/2005, at 5, 8. Former District Attorney Downs and his assistants would also attend every preliminary hearing held in Bradford County which, because it did not have a central court system, necessitated travel by the district attorney and his staff to the individual magistrate's offices where the hearings were held. Trial Court Opinion, 5/27/2005, at 3 (quoting Downs Letter, at 2). Former District Attorney Downs noted that because Bradford County has the second largest geographical area of Pennsylvania's 67 counties the amount of time spent travelling to these hearings was considerable. *Id.* Additionally, former District Attorney Downs indicated that, at the time of the hearing on Appellant's motion, he was awaiting the commencement of another homicide case, and there were two additional suspicious deaths involving a shooting and a fire that his office was investigating and would shortly be making a charging decision with respect thereto. Further, he averred in his letter that he was dealing with "numerous" other cases involving the manufacture and use of methamphetamine and the attendant violence it created. *Id.* We conclude that all of these facts amply supported the trial court's finding that former District Attorney Downs' assertion that he lacked sufficient resources to investigate and prosecute a case of this magnitude and complexity was credible and valid.[37]

Appellant alternatively argues that "[t]here was no testimony that funds would not be in the budget in this matter for the prosecution of this case by the District Attorney of Bradford County," Appellant's Brief at 28, and cites to the case of *Yost v. McKnight,* 865 A.2d 979 (Pa.Cmwlth.2005) as establishing that a district attorney has the authority to hire a special

---

37. Deputy Attorney General Blessington noted at the hearing on Appellant's motion that hundreds of investigators had worked on the case and their reports filled two entire boxes. N.T. Hearing, 5/9/05, at 14.

assistant district attorney in capital murder cases if the money exists within his budget to do so. While we agree that *Yost* stands for this proposition, the record here indicates that, unlike in *Yost*, former District Attorney Downs did not have the option of hiring a "special assistant district attorney" or any other extra personnel to help him prosecute this case. He testified that he had only approximately $20,000 allocated in his yearly budget which was designated for payment of outside experts, and he related that he utilized this money to pay expert witnesses. N.T. Hearing, 5/9/05, at 13. He further specifically averred that he would have to use this money if he wanted to hire a special assistant district attorney. *Id.* Thus, he was faced with a Hobson's choice. If he elected to hire a special prosecutor, he would have to face the prospect of potentially being unable to pay for the use of expert witnesses in all of the other criminal cases he would be handling for the remainder of the year, which would leave him at a serious disadvantage in being able to fulfill his prosecutorial duties. The record, therefore, belies Appellant's suggestion that former District Attorney Downs had the budgetary flexibility to hire extra personnel in this case.

Appellant presently decries former District Attorney Downs' failure to seek additional funds from the Bradford County Commissioners for prosecution of this case. However, the trial court found that the likelihood of receipt of additional monies under these circumstances to be "speculative," as evidenced by the County's clear concern over the costs of the case, which was reflected in a written request from its solicitor to intervene in the case and be heard on the issue of expenditures relating to Appellant's defense—a request the trial court denied. Trial Court Opinion, 5/27/05, at 8, 9 n. 2. The trial court's findings in this regard are well founded.

Further, we see nothing in the plain language of 71 P.S. § 732–205(a)(3) requiring a district attorney to first make an appeal for additional appropriations, beyond those already budgeted for the operation of his or her office, before requesting the attorney general's involvement. This statute permits a request whenever a district attorney "lacks resources," and

this condition is surely met whenever the cost of a prosecution will exceed the bounds of a district attorney's budgetary capacity. Certainly it is within the district attorney's discretion to request additional funds be disbursed from the county treasury in such circumstances, but as an elected public official who is, by necessity, intimately involved with his or her county's budgetary process, he or she is in the best position to gauge the likelihood of success of such a request. Therefore, we will not impose a requirement under 71 P.S. § 732–205(a)(3) which our legislature has not chosen to include.

We also discern no abuse of discretion in the trial court's finding that former District Attorney Downs had made sufficient averments in his letter regarding the existence of a potential conflict of interest sufficient to justify the intervention of the Office of the Attorney General under 71 P.S. § 732–205(a)(3). The trial court noted that, because former District Attorney Downs averred he "was a party to the arrangements which had the investigators at the jail with [Appellant]," in light of Appellant's motion to suppress the statement he made at the jail, it was "not unreasonable" for former District Attorney Downs "to assume he might have been called as a witness." Trial Court Opinion, 5/27/05, at 6–7. Due to the nature of the statements, the trial court deemed the request for recusal on this basis to have been "prudent and certainly not an ethically inappropriate thing to do." *Id.*

After review of the record we find no basis to disturb this determination since, under these circumstances, there was a significant chance that the conduct of the prosecution could be disrupted by the district attorney being called as a witness, which would, in turn, implicate his ability to prosecute the case, *see* Pa.R.P.C. 3.7(a) (providing that an attorney who knows that he or she is likely to be called as a necessary witness in a pending trial is not permitted to act as an advocate in that trial). It was indeed prudent to eliminate the prospect of such disruption, and its attendant consequences, before trial commenced.

The record further reflects that former District Attorney Downs had represented other additional facts in his letter to the attorney general to establish a potential conflict of interest on his part in continuing with the prosecution of the case. In *Commonwealth v. Eskridge*, 529 Pa. 387, 604 A.2d 700 (1992), we took notice of the prospect for a conflict of interest any time a district attorney's professional judgment and ability to serve the public interest may be impaired by extraneous considerations. We reminded: "[A] criminal prosecutor . . . unlike a private attorney, must exercise independent judgment in prosecuting a case and 'has the responsibility of a minister of justice and not simply that of an advocate.'" 529 Pa. at 390, 604 A.2d at 701 (quoting Pennsylvania Rule of Professional Conduct 3.8, Comment.) We further observed: "A defendant does not have a right not to be prosecuted; he does, however, have a right to have his case reviewed by an administrator of justice with his mind on the public purpose, not by an advocate whose judgment may be blurred by subjective reasons." *Eskridge* 529 Pa. at 390, 604 A.2d at 701 (citing *Commonwealth v. Dunlap*, 233 Pa.Super. 38, 335 A.2d 364, 368 (1975) (Hoffman, J. dissenting)). Here, former District Attorney Downs properly and commendably recognized the potential that his close personal relationship with the slain deputies would cloud his professional judgment and possibly interfere with his ability to carry out of the duties of his office by compromising his ability to make critically important legal decisions regarding the conduct of this prosecution. His representations in the letter concerning this potential impairment were sufficient to establish a potential conflict of interest on his part sufficient to justify the attorney general's intervention under 71 P.S. § 732–205(a)(3).

█ Finally, we note our agreement with the trial court that Appellant's suggestion that former District Attorney Downs' request for the intervention of the attorney general was somehow invalidated because it was made over four and a half months after the homicides occurred is unavailing. The plain language of 71 P.S. § 732–205(a)(3) places no time limits on when a request for the attorney general's intervention must

be made. Under the terms of this statutory provision, the attorney general's intervention may be requested by the district attorney for lack of resources or the representation of a conflict of interest at any time during the course of a prosecution in a county criminal court. *See* 71 P.S. § 732–205(a) ("The Attorney General shall have the power to prosecute in any county criminal court. . . .").

## III.

### JURY SELECTION ISSUES

#### A. *Excusal of a juror for a past larceny conviction*

■ Appellant argues the trial court violated his constitutional right to a trial by a jury of his peers when, during the jury selection process, it dismissed a juror on the basis of a prior conviction for the crime of larceny. Appellant maintains the trial court erred because there was no court record of this juror's conviction and, thus, no proof that it existed. Our review of the record indicates Appellant is mistaken.

A prospective juror indicated in his response to the jury questionnaire that he had been previously convicted of a crime. After investigation, the Commonwealth was able to obtain a record from the Pennsylvania State Police indicating the juror had been charged in 1966 with the offense of larceny and had paid fines and restitution. N.T. Voir Dire, 12/13/05 MS, at 56–57. The final disposition of the offense was not indicated in the state police record. Consequently, during *voir dire*, the trial court inquired of the juror as to the nature of the offense and the outcome of the case. The prospective juror admitted to having been charged with larceny in connection with the theft of stereos and other items which he took from a car. He recalled appearing in front of a justice of the peace and paying a fine or restitution. *Id.* at 58–59. He also noted that the existence of this offense had turned up in a background check when he attempted to buy a pistol. *Id.* at 60. The trial court excluded him on the basis that he was statutorily disqualified from serving on the jury pursuant to 42 Pa.C.S.A. § 4502(a)(3), which provides:

## § 4502. Qualifications of jurors

(a) **General rule.**—Every citizen of this Commonwealth who is of the required minimum age for voting for State or local officials and who resides in the county shall be qualified to serve as a juror therein unless such citizen:

\* \* \*

(3) has been convicted of a crime punishable by imprisonment for more than one year and has not been granted a pardon or amnesty therefor.

42 Pa.C.S.A. § 4502(a)(3).

We discern no error on the part of the trial court in excluding this prospective juror. In 1966, the crime of larceny was statutorily defined as follows:

Whoever commits larceny, is guilty of felony, and shall, upon conviction thereof, be sentenced to pay a fine not exceeding two thousand dollars ($2,000.00) or to undergo imprisonment, by separate or solitary confinement at labor, not exceeding five (5) years, or both.

18 P.S. § 4807 (repealed).

Based on the prospective juror's agreement that he had been charged with larceny, and his testimony that he appeared before a justice of the peace and paid fines or restitution, the trial court had ample basis to conclude that he had pled guilty to this offense. His guilty plea constituted the functional equivalent of a conviction. *Commonwealth v. Jones*, 593 Pa. 295, 310, 929 A.2d 205, 214 (2007). Further, the prospective juror did not testify that he had ever been pardoned for this offense, and the likelihood that no such pardon was ever issued was further evidenced by the fact that it still was listed on his criminal record and found during a background check. Consequently, since the prospective juror had been convicted of larceny, and that offense was punishable by more than one year imprisonment, the trial court properly ruled him to have been disqualified from jury service under 42 Pa.C.S.A. § 4502(a)(3).

## B. Denial of Appellant's motions to exclude particular jurors for cause

Appellant next argues that the trial court erred in failing to exclude certain prospective jurors for cause. We note that, though Appellant has reproduced at length in his brief excerpts of testimony from the *voir dire* hearings regarding seven jurors, Robert Warren, Martin Williams, Olyn Chaffee, Mariette Hartford, Tara Cummings, Gerald Twigg and Tyrone Binford, Appellant only advances a specific argument with respect to three of these prospective jurors, Chaffee, Hartford, and Cummings. Thus, we will restrict our discussion accordingly.[38]

In regards to these three jurors Appellant makes one lone global assertion—that all "should have been removed for cause as they had a significant relationship with the victims and/or their families." Appellant's Brief at 40. This claim is unsupported by the record.

A trial court's decision regarding whether to disqualify a juror for cause is within its sound discretion and will not be reversed in the absence of a palpable abuse of discretion. *Commonwealth v. Stevens,* 559 Pa. 171, 197, 739 A.2d 507, 521 (1999). In determining if a motion to strike a prospective juror for cause was properly denied our Court is guided by the following precepts:

> The test for determining whether a prospective juror should be disqualified is whether he is willing and able to eliminate the influence of any scruples and render a verdict according to the evidence, and this is to be determined on the basis of answers to questions and demeanor.... It must be determined whether any biases or prejudices can be put aside on proper instruction of the court.... A challenge for cause should be granted when the prospective juror has such a close relationship, familial, financial, or situational, with the parties, counsel, victims, or witnesses that the court will

38. Appellant exercised peremptory challenges to exclude all seven of these jurors and, thus, none served on the final jury panel or were selected as alternate jurors.

presume a likelihood of prejudice or demonstrates a likelihood of prejudice by his or her conduct or answers to questions.

*Commonwealth v. Cox,* 603 Pa. 223, 249, 983 A.2d 666, 682 (2009) (quoting *Commonwealth v. Wilson,* 543 Pa. 429, 442, 672 A.2d 293, 299 (1996)).

■ A review of the testimony of prospective jurors Chaffee, Hartford and Cummings given during *voir dire* indicates that the nature of their relationships with the victims or their families was not of such a nature that a presumption of prejudice was warranted, nor did their answers to the court's questions during *voir dire* evidence a likelihood that their ability to serve as fair and impartial jurors had been prejudiced by these relationships. Chaffee was the Athletic Director for Northeast Bradford High School and, during his tenure in that position, Deputy VanKuren's wife Elaine became involved with the soccer booster club at the school because of her step-daughter's participation as a member of the soccer team. N.T. Voir Dire, 12/8/05 MS, at 72, 78–79. Chaffee testified, however, that he never had any interaction with either Ms. VanKuren or her stepdaughter. *Id.* at 79–80. He additionally indicated that his limited involvement with both individuals would have no effect on his ability to judge the case, and, also, that he was able to be fair and impartial and to follow the judge's instructions. *Id.* at 85–86, 88.

■ Hartford testified that her husband was acquainted with Deputy VanKuren, since the two of them shot archery together over 12 and a half years ago before she and her husband were married. N.T. Voir Dire, 12/8/05 AS, at 89. However, she herself had never met Deputy VanKuren, nor did her husband continue to shoot archery with him after they were married. *Id.* Thus, it is clear that, at the time of the trial, neither she nor her husband had a close relationship with the deceased deputy. Further, Ms. Hartford unequivocally stated that she would follow the judge's instructions and would not allow any extraneous matters to influence her were she seated as a juror. *Id.* at 96, 100.

■ At the time of jury selection, Cummings was a case-worker for Bradford County Children and Youth Services, and she had previously worked as a correctional officer at the Bradford County Jail. N.T. Voir Dire, 12/12/05 AS, at 156. However, during the course of this employment she had never met either of the two slain deputies. She had no close relationship with former District Attorney Downs and knew of him only by virtue of his position and the fact that he worked at the courthouse. *Id.* at 157. In all of her years working for Bradford County, she recalled only having spoken once to former District Attorney Downs regarding a case. *Id.* She additionally testified that she would follow the judge's instructions and had no opinion of Appellant's guilt, noting that "all I know is that two [d]eputies were murdered. I don't know who did it." *Id.* at 173. Considering all of the aforementioned relevant testimony of these three witnesses, we see nothing to suggest that the trial court abused its discretion in denying Appellant's motion to strike them for cause.

*C. Decision to hold a portion of the individual voir dire of prospective jurors in the office of a District Magistrate because of a bomb threat for the Bradford County Courthouse*

■ Appellant next argues that the trial court erred in holding individual *voir dire* in the nearby office of a district magistrate during the afternoon of the final day of jury selection, because of a bomb threat being telephoned to the Bradford County Courthouse. Our review of the transcript of these proceedings indicates that after the defendant was transported to the magistrate's office, the jury selection resumed without further incident or disruption. The trial court has further noted that "[w]hile there were space limitations in the small courtroom, no one was intentionally excluded. The office remained open and we were advised business was conducted (i.e. payment of fines, etc.) while the *voir dire* process was ongoing." Trial Court Opinion, 12/15/05, at 1–2.

Appellant specifically contends that the trial court's decision to conduct the *voir dire* at the office of the district magistrate deprived him of his right under Article I, Section 9 of the

Pennsylvania Constitution to a public trial since no members of the public were present during the *voir dire* process. Appellant's claim is meritless. Although no members of the public may have been actually present in the magistrate's courtroom where *voir dire* was taking place, the magistrate's office, which contained the courtroom, was open to the public during the entirety of the *voir dire* proceeding. The record does not reflect that any member of the public was excluded from the magistrate's courtroom during this time, or that a person would have been excluded from observing the *voir dire* if he or she wished to do so. Moreover, a full and complete transcript was made of these proceedings which is a matter of public record. Thus, Appellant's right to a public trial secured by Article I, Section 9 was not violated under these circumstances. *See Commonwealth v. Harris,* 550 Pa. 92, 703 A.2d 441 (1997) (finding no violation of a defendant's right to a public trial where individual *voir dire* was conducted in an anteroom adjacent to the courtroom, since there was no evidence any member of the public was excluded by the court or otherwise prohibited from entering to observe).

## IV.

## TRIAL ISSUES REGARDING WITNESS TESTIMONY

### A. *April Harris Duva*

■ Appellant contends that the trial court erred by precluding him from questioning Duva about the reason her trial testimony was inconsistent with that which she gave at an earlier preliminary hearing, and, also, differed from the contents of statements she previously gave to state police. Appellant wished to establish through this cross-examination that Duva had testified untruthfully at the preliminary hearing and given statements that were not entirely true to investigating officers because Appellant's brother, Mark Briggs, threatened her. Appellant is entitled to no relief on this basis.

■ A trial court has discretion to determine both the scope and the permissible limits of cross-examination. *Com-*

*monwealth v. Rivera,* 603 Pa. 340, 371, 983 A.2d 1211, 1230 (2009). The "trial judge's exercise of judgment in setting those limits will not be reversed in the absence of a clear abuse of that discretion, or an error of law." *Commonwealth. v. Birch,* 532 Pa. 563, 566, 616 A.2d 977, 978 (1992) (internal quotation marks omitted).

Our review of the record compels us to agree with the trial court that Appellant did not provide the requisite foundation for the avenue of cross-examination he wished to pursue, since there was no evidence of record to establish that Mark Briggs was the person who threatened Duva. Indeed, Mark Briggs testified immediately before Duva at trial, and he was extensively cross-examined by Appellant, through counsel, and asked repeatedly if he had threatened Duva. He denied having done so. N.T. Trial, 1/24/06 AS, at 42–43, 65–66. Thus we discern no abuse of discretion by the trial court in barring, on this basis, Appellant's desired cross-examination of Duva.

Furthermore, Appellant suffered no prejudice from the trial court's denial of his requested line of cross-examination, as we are in accord with the trial court's finding that Appellant's requested cross-examination was irrelevant under the circumstances. Any identification by Duva of Mark Briggs as the person who allegedly threatened her would only have been arguably relevant to the central issue in the case, i.e., who killed the deputies, if there was evidence suggesting Mark Briggs threatened Duva in order to conceal his own involvement in the murders. The trial court found no evidence to suggest Mark Briggs was involved in committing the murders. Trial Court Opinion, 7/6/07, at 38. Additionally, the trial court apparently was willing to allow Appellant to raise a possibility of Mark Briggs' involvement in the murders through cross-examination, if he could lay a proper evidentiary foundation. The trial court indicated it would allow Appellant to cross-examine Duva about any potential threats from Mark Briggs, provided Appellant followed through on his offer of proof that he would produce evidence showing that Mark Briggs was at the junkyard at the time of the murders. Trial Court Opinion, 7/6/07, at 38–39. The trial court found that Appellant pro-

duced no such evidence. *Id.* at 39. As our review of the record indicates that it supports the trial court's conclusion, its decision to prohibit Appellant from pursuing cross-examination on these grounds likewise does not constitute an abuse of discretion.

### B. Albert "Bert" Briggs

 Appellant avers that the trial court improperly precluded him from cross-examining his cousin, Albert 'Bert' Briggs, about potential motives for his testimony. Around 6:00 a.m. on April 1, 2004, Albert Briggs observed Appellant open the door of a camper located on his property. N.T. Trial, 1/25/06 AS, at 39. Albert Briggs, aware that Appellant was being sought in the murder of the deputies, told his family to leave. After they left, Albert Briggs inspected the camper, but did not see Appellant inside. Albert Briggs then got in his truck and drove to the police command center which was overseeing the manhunt for the deputies' killer to tell law enforcement personnel his observation of Appellant. *Id.* at 41.

At trial Appellant, through counsel, sought to cross-examine Albert Briggs about an alleged motive for testifying favorably for the Commonwealth—namely that Albert Briggs suffered a drop in income after this incident and that the police allegedly damaged the camper and his house in their search for Appellant. *Id.* at 43. The trial court denied the requested cross-examination as irrelevant. *Id.* at 44. Appellant presently contends that the trial court erred, averring that "Briggs could have been testifying on behalf of the Commonwealth to elicit good favor with the Commonwealth and with the community as Albert 'Bert' Briggs went from a successful self-employed businessman to earning substantially lesser amount[s] of money due to the arrest of his cousin and his role in possibly harboring his cousin." Appellant's Brief at 45. This argument is unavailing.

As the trial court aptly noted:

Albert Briggs testified in a manner consistent with his conduct. He saw [Appellant], and he notified the police. It was thereafter that the alleged property damage and in-

come loss occurred. Thus, since the alleged motivating factors occurred after the conduct which formed the basis of the testimony, those factors, logically, could not have motivated the testimony. That disconnect, between the potential motivating factors and the testimony, renders the subject cross-examination irrelevant.

Trial Court Opinion, 7/6/07, at 42. We agree with the trial court's reasoning as Appellant's suggested motive for Albert Briggs' trial testimony is wholly unsupported by the record; thus, there was no abuse of discretion by the trial court in prohibiting this line of inquiry.[39]

## C. Mark Marcoccia

Appellant first claims the trial court improperly allowed Mark Marcoccia, who at the time of trial had pled guilty to federal drug charges, to testify that he had sold a .44 Magnum Ruger to Appellant at a point prior to the murder. Appellant contends that, because this constituted testimony regarding a "prior bad act" which was not connected to the charges for which he was on trial, its admissibility had no legitimate purpose and was highly prejudicial to him.[40] After review, we conclude that this claim affords Appellant no relief.

A trial court's decision to allow the admission of evidence is a matter within its sound discretion, and we will reverse that decision only when it has been shown that the trial court abused that discretion. *Commonwealth v. Reed*, 605 Pa. 431, 445, 990 A.2d 1158, 1167 (2010). The particular Pennsylvania Rule of Evidence governing the admission of "prior bad acts" is Pa.R.E. 404(b) which provides, in relevant part:

**39.** Appellant advances in his brief an additional proposed theory for allowing the cross-examination, namely that "Albert Briggs' motive in testifying could have been to get even with his cousin for all the hurt that Appellant had caused his family." Appellant's Brief at 45. This speculative assertion is waived as it was never presented to the trial court. Pa.R.A.P. 302(a); *LaCava, supra.*

**40.** Appellant sought to preclude Marcoccia from mentioning this sale via pretrial motion and timely trial objection prior to Marcoccia testifying.

**(b) Other crimes, wrongs, or acts.**

(1) Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith.

(2) Evidence of other crimes, wrongs, or acts may be admitted for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident.

(3) Evidence of other crimes, wrongs, or acts proffered under subsection (b)(2) of this rule may be admitted in a criminal case only upon a showing that the probative value of the evidence outweighs its potential for prejudice.

Pa.R.E. Rule 404(b)(1)-(3). Under this rule, the admission of prior "bad acts" is inadmissible for the sole purpose of proving the defendant has a bad character, or a "criminal propensity." *Commonwealth v. Powell*, 598 Pa. 224, 246, 956 A.2d 406, 419 (2008). Nevertheless, this rule permits the admissibility of such evidence for other relevant purposes such as:

showing the defendant's motive in committing the crime on trial, the absence of mistake or accident, a common scheme or design, . . . to establish identity[,][or] where the acts were part of a chain or sequence of events that formed the history of the case and were part of its natural development.

*Id.* However, admission for these purposes is allowable only whenever the probative value of the evidence exceeds its potential for prejudice. Pa.R.E. 404(b)(3).

At trial, Marcoccia testified regarding the sale of the gun to Appellant as follows:

[Commonwealth]: Did you know [Appellant] before you ran into him in jail?

A. Yes, I did.

Q. For how long a period of time?

A. Uh, approximately six months.

Q. And when you saw him in the Bradford County Jail, late November of '04, or sometime thereafter, did you have any conversation with him about a gun?

A. Yes, we did.

Q. And could you explain to the jury what that conversation was?

\* \* \*

A. Yes, I'd sold a gun to [Appellant]. And I was concerned as to what happened to the gun.

Q. Did you sell the gun to him before the killings?

A. Yes, I did.

Q. And you were concerned about the gun that you'd sold to him, so what, if anything, did you say to [Appellant]?

A. I asked him about the gun, and he'd said that it was safe, it was a Ruger, .44.

Q. What, what kind of gun was it?

A. A Ruger.

Q. And what caliber?

A. .44 Magnum.

Q. Revolver or semi-automatic?

A. Revolver.

Q. Okay. And [Appellant] said it was what?

A. He said it was safe.

Q. Now, did you have any conversation with him at that time about what if anything happened up at the junkyard involving [Appellant] and the Sheriffs?

A. Uh, I don't believe at that time,—I don't believe at that time, we talked about anything.

Q. Did you ask him anything at all about what happened or anything of that nature,—

A. Uh—

Q. —at that first conversation?

A. Yes, I just told him sometime I wanted to hear the story about it.

Q. And what did he say in response to that?

A. And he said, some day.

Q. And did that some day come some weeks or months later?

A. Yes, weeks later,—uh, we were going down to the law library together, and he'd said, here, I'll let your buddy Brad Brown tell you the story. . . .

N.T. Trial, 1/27/06 MS, at 66–68.

It is clear from this testimony that Marcoccia's brief mention of Appellant's previous purchase of the gun from him was not part of an effort by the Commonwealth to show that Appellant was a person of bad character who purchased guns from drug dealers as Appellant suggests; rather, it constituted part of the sequence of events forming the history of this case. Marcoccia's testimony established the prior relationship between himself and Appellant, and his interest in learning from Appellant the details surrounding the shooting of the deputies. This explained the manner by which Marcoccia and Appellant came to have their later conversation in which Appellant showed Marcoccia the content of his cellmate's statement containing Appellant's inculpatory admissions which Appellant admitted to Marcoccia were accurate. Further, as the trial court found, this aspect of Marcoccia's testimony was relevant to show Appellant's ability to acquire handguns. *See Commonwealth v. Williams*, 537 Pa. 1, 20, 640 A.2d 1251, 1260 (1994) (holding that evidence of defendant's possession of guns which were not the murder weapons was relevant to show that he "readily obtained and disposed of handguns"). All of this constituted probative evidence. Because the Commonwealth did not introduce the actual .44 caliber handgun into evidence, and due to the fact the jury also heard evidence indicating that Appellant had access to other handguns stored in his residence,[41] as well as testimony that he sometimes carried a handgun on his person,[42] any prejudicial effect of Marcoccia's testimony was scant in comparison to its probative value.

**41.** *See* N.T. 1/24/06 MS, at 23 (recounting various weapons police removed, pursuant to a warrant, from the farmhouse in which Appellant resided, including two .45 caliber pistols and a .22 caliber revolver).

**42.** *See* N.T. Trial, 1/24/06 AS, at 101 (testimony of April Harris Duva acknowledging that Appellant sometimes carried a handgun secreted in the small of his back).

▊ Appellant also asserts that the trial court erred in failing to grant his request for a mistrial when Marcoccia made the following reference to being subjected to a polygraph test during his testimony on redirect examination: [43]

[The Commonwealth]: As part of your cooperating agreement, in terms of getting a reduced sentence, does that require you to tell the truth?

A. Yes, it does.

Q. And if you don't tell, if you're found not to have told the truth, in any setting whatsoever, is the deal off?

A. The deal is off.

Q. Have you told this Jury the truth today?

A. Yes, I have, in fact, in the plea agreement I am subject to polygraph.

N.T., 1/27/06 MS, at 95–96. Appellant contends that the Commonwealth, by asking questions relating to the plea agreement on redirect examination, after having already asked about it during direct examination, was soliciting answers which gave Marcoccia the opportunity to a use the word polygraph. Appellant alleges that this was an improper effort by the Commonwealth to give Marcoccia's testimony "supercredibility." Appellant's Brief at 53. This claim is groundless.

The trial court found that the Commonwealth did not deliberately elicit this remark, and our review of the record discloses nothing to disturb this conclusion. When the Commonwealth asked Marcoccia about the plea agreement during direct examination he mentioned nothing about a polygraph. Thus, the Commonwealth had no reason to believe Marcoccia would mention it when Marcoccia was asked again about the agreement during redirect examination. Additionally, we discern no improper motive on the part of the Commonwealth in

43. Marcoccia had previously testified on direct examination that his plea agreement for the federal drug charges contained a stipulation that he could petition for a reduced sentence if he cooperated with authorities and informed them of his or others' participation in criminal activities, and also that the agreement required him to give truthful information. N.T. Trial, 1/27/06 MS, at 72.

asking Marcoccia about the agreement during redirect since this appeared to be part of an effort by the Commonwealth to rehabilitate Marcoccia, after Appellant's cross-examination, by reminding the jury that Marcoccia was required by the agreement to provide truthful information to the police and, thus, to establish for the jury that Marcoccia would not benefit from lying about the contents of his conversation with Appellant.

Further, as the trial court found, Marcoccia merely mentioned the fact that he was **subject** to a polygraph, but he did not mention the results of any such test. We note also that the Commonwealth did not further exploit the remark to the jury and immediately ceased questioning. Although Appellant's counsel indicated at that time that he did not want a curative instruction, the trial court did not allow the trial to continue, but, instead, elected to take the entire matter under advisement and entertain further arguments from the parties regarding an appropriate course of action. Since this occurred late on Friday afternoon, the trial court adjourned the proceedings for the weekend. When court reconvened the following Monday, the trial court again heard argument from the parties and, afterwards, gave the jury a curative instruction in which it expressly informed the jury that polygraph test results are not admissible, as such results are unreliable. The trial court explicitly directed the jury to disregard what they had heard regarding the polygraph test. N.T. Trial, 1/30/06 MS, at 33–34. Additionally, the trial court asked the jury panel, collectively, whether any of them could not follow this instruction, or if any of them had previously taken a polygraph test. No juror answered in the affirmative. Under these circumstances, Appellant suffered no prejudice from Marcoccia's fleeting reference to a polygraph test, and Appellant's request for a mistrial was properly denied by the trial court. *See Commonwealth v. Miller*, 497 Pa. 257, 263–64, 439 A.2d 1167, 1170–71 (1982) (ruling that new trial not warranted due to witness' unsolicited response to prosecutor's question that detective "wanted to give me a lie detector test to make sure I was telling the truth" since the response did not indicate that witness had taken the test and obtained a

favorable result, and trial court gave "prompt and adequate" curative instructions); *see also Commonwealth v. Brinkley,* 505 Pa. 442, 453, 480 A.2d 980, 986 (1984) (holding that defendant suffered no prejudice by witness' "gratuitous reference" to polygraph test, when reference was not elicited by counsel, the witness did not disclose the results of the polygraph test, and the trial court gave a curative instruction to the jury immediately thereafter).

### D. John Schwenkler

Appellant argues that the trial court erred by precluding him from presenting, at trial, the testimony of John Schwenkler, a public defender, who had represented Appellant the day before the shootings at a hearing in a city court proceeding in Elmira, New York. Appellant contends that Schwenkler would have testified that, though Appellant fully expected to be taken into custody at the conclusion of that hearing, Appellant nevertheless voluntarily appeared at that hearing. Appellant now asserts, somewhat implausibly, that Schwenkler's proposed testimony, if permitted, would have established that Appellant did not fear being arrested or incarcerated—thereby negating the Commonwealth's suggested motive that he killed the deputies because he did not want to be taken into custody. The trial court excluded this testimony as irrelevant, and we agree with this determination.[44]

Pennsylvania Rule of Evidence 401 defines relevant evidence as "evidence having any tendency to make the existence of a fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Pa.R.E. 401. Pennsylvania Rule of Evidence 402 provides that "[e]vidence that is not relevant is not admissible." As our Court has observed: "the rule that irrelevant evidence is not admissible is categorical." *Commonwealth v. Cook,* 597 Pa. 572, 602, 952 A.2d 594, 612 (2008).

---

**44.** It is well established that the Commonwealth is not required, as a matter of law, to prove the accused's motive even where the offense charged is murder in the first degree. *Commonwealth v. Keaton,* 556 Pa. 442, 456, 729 A.2d 529, 536 (1999).

Simply because Appellant acted in a particular manner previous to the day on which the deputies were shot, and under entirely different circumstances, i.e., at a court hearing in the presence of his attorney and court personnel, in no way tends to make it less probable that he shot the deputies when they attempted to take him into custody at his residence, a happenstance he was not expecting. Thus, Appellant's proposed testimony was inadmissible under Pa.R.E. 402, and the trial court did not err in precluding it. To hold otherwise would contravene the well recognized evidentiary principle of *res inter alios acta*, which provides that "a thing or event which occurs at a time different from the time in issue is generally not admissible to prove what occurred at the time in issue." *Black's Law Dictionary,* 1178 (5th Ed.1979); *see also Commonwealth v. Majorana,* 503 Pa. 602, 605, 470 A.2d 80, 81 (1983) (observing that the rule of *res inter alios acta* underlies judicial concepts of relevance and precludes use of a past act to show present conduct).

## V.

## JURY INSTRUCTIONS–TRIAL

*A. Denial of request for Accomplice Testimony Instruction*

 Appellant argues the trial court erred in failing to give the jury an accomplice testimony instruction—the so-called "corrupt and polluted source instruction" [45]—with respect to the testimony of Mark Briggs and Arlan Briggs. The trial court denied Appellant's requested instruction on the basis that there was no evidence of record to support the notion that either Mark or Arlan Briggs had acted as accomplices in the murder of the deputies. Our comprehensive review of the entire record confirms the trial court findings; hence, its denial of the requested instruction was proper. *See*

45. Such an instruction informs the jury "that if it finds that a certain witness who testified against the defendant was an accomplice of the defendant in a crime for which he is being tried, then the jury should deem that witness a 'corrupt and polluted source' whose testimony should be considered with caution." *Commonwealth v. Collins,* 598 Pa. 397, 439, 957 A.2d 237, 262 (2008).

*Commonwealth v. Rega,* 593 Pa. 659, 690, 933 A.2d 997, 1015 (2007) (holding that where trial evidence showed that individual had taken no part in the crimes for which the defendant was on trial the individual could not be considered an accomplice and, thus, was not entitled to corrupt and polluted source jury instruction).

### B. Trial court's instruction to the jury on implied admission and/or adoptive admissions

 Appellant avers that the trial court erred in not limiting its instruction regarding an implied or adoptive admission [46] regarding Appellant's nodding of his head in response to Neal Saunders' statement that people in the community were saying he killed the deputies. Appellant contends that the trial court improperly denied his request that the instruction be limited to "non-police" statements and, also, that it "was inappropriate given the fact that Appellant was told by Neal Saunders that people were saying this about him, not that he actually did it." Appellant's Brief at 58.

We fail to see error in the trial court's instruction. As the Commonwealth points out, Appellant was not in police custody at the time he nodded his head in response to Saunders' statement, nor were any police officers present at the scene of the conversation to observe his actions. Thus, Appellant's Fifth Amendment privilege against self incrimination was not implicated under these particular circumstances and the trial court did not err by refusing to give a jury instruction containing Appellant's requested limiting language. *Cf. Commonwealth v. Dravecz,* 424 Pa. 582, 227 A.2d 904 (1967) (holding that when an individual stands mute in response to the police reading of the statement of third party implicating him the individual's silence cannot be used against him in a criminal proceeding as a "tacit admission" evidencing his guilt); *Miranda,* 384 U.S. 436, 468 n. 37, 86 S.Ct. 1602 ("[I]t is impermissible to penalize an individual for exercising his Fifth

46. *See* Pa.R.E. 803(25)(B) (permitting introduction into evidence of a statement in "which the party has manifested an adoption or belief in its truth").

Amendment privilege when he is **under police custodial interrogation.** The prosecution may not, therefore, use at trial the fact that he stood mute or claimed his privilege in the face of accusation." (emphasis supplied)). Further, the question of whether Appellant was nodding his head as an affirmation of his act of shooting the deputies, or an acknowledgement of community sentiment, was a factual determination within the province of the jury. The trial court's instruction appropriately set forth the pertinent legal standards which the jury was to follow in deciding this question.

## VI.

## JURY INSTRUCTIONS–PENALTY PHASE

### A. *Trial Court's refusal to instruct the jury on residual or lingering doubt*

Appellant claims the trial court erred by failing to give the jury his requested instruction regarding "residual" or "lingering" doubt. Appellant's proposed instruction would have informed the jury that they could consider any residual or lingering doubt they may have regarding Appellant's guilt in determining whether to impose a life sentence without release. Appellant's sole argument with respect to this claim is that "this instruction was appropriate and proper under the circumstances." Appellant's Brief at 63. Appellant fails to elaborate on what particular "circumstances" he is referring to, nor does he develop this argument that the instruction was appropriate by reference to the relevant evidence of record, if any, which supports this claim, or to pertinent legal authority. Hence, as this claim is utterly undeveloped, it is waived for purposes of this direct appeal.

### B. *Trial Court's use of only one jury slip*

Appellant argues that the trial court erred in distributing only one verdict slip to the jury for use in their deliberations. He contends this improperly allowed the jury to lump all of the aggravating factors concerning the murder of each deputy together and to weigh them collectively against

the one mitigating circumstance which they found. The trial court noted that Appellant was given a copy of the penalty phase verdict slip the night before the jury was to deliberate, and counsel made no objection to its form or contents. Trial Court Opinion, 7/6/07, at 51. It was only after the jury had returned its sentence of death and was discharged by the trial court, that Appellant presented this objection to the trial court. N.T. Penalty Phase Hearing, 2/9/06, at 67–68, 71. Because Appellant failed to make a timely objection regarding the verdict slip to the trial court, which raised the matters he presently complains of, when the trial court still had an opportunity to address them while the jury remained empanelled, he has waived this issue. Pa.R.A.P. 302(a).

## VII.

## CONSTITUTIONAL CHALLENGES TO THE DEATH PENALTY AND PENNSYLVANIA'S CHOSEN METHOD OF EXECUTION—DEATH BY LETHAL INJECTION

### A. Constitutional challenge to the death penalty

 Appellant next argues that the trial court erred by not finding the death penalty unconstitutional, claiming that our mandatory death penalty statute violates his right to a jury trial under Article I, Sections 6 and 9 of the Pennsylvania Constitution, and the Sixth Amendment of the United States Constitution. Appellant also asserts that this statute violates the Eighth and Fourteenth Amendment to the United States Constitution and Article I, Section 13 of the Pennsylvania Constitution "as a violation of evolving standards of decency in a maturing society." Appellant's Brief at 63–64. This is the sum total of Appellant's entire argument contained in his brief to our Court.

Rather than developing a coherent argument with respect to each of these claims, with proper citation to relevant case law supporting his argument as required by our appellate rules, Appellant simply attempts to incorporate by reference a brief

authored by another attorney, Thomas Raup,[47] which Appellant appended to his motion in the trial court to have the death penalty declared unconstitutional—a motion which the trial court denied. Appellant also attaches a copy of this brief as an appendix to his current brief filed with our Court.

We have previously held that such "incorporation by reference" is an unacceptable manner of appellate advocacy for the proper presentation of a claim for relief to our Court. *Commonwealth v. Edmiston*, 535 Pa. 210, 238 n. 3, 634 A.2d 1078, 1092 n. 3 (1993) (specifying that all claims a litigant desires our court to consider are required to be set forth in the appellate brief and not just incorporated by reference); *Pines v. Farrell*, 577 Pa. 564, 570 n.3, 577 Pa. 564, 848 A.2d 94, 97 n. 3 (2004) (holding that reliance on the "briefs and pleadings already filed in this case" was "not a recommended form of advocacy" and noting that "this Court is not obliged to root through the record and determine what arguments, if any, respondent forwarded below, nor are we obliged to fashion an argument on his behalf."). Our rules of appellate procedure specifically require a party to set forth in his or her brief, in relation to the points of his argument or arguments, "discussion and citation of authorities as are deemed pertinent," as well as citations to statutes and opinions of appellate courts and "the principle for which they are cited." Pa.R.A.P. 2119(a), (b). Therefore our appellate rules do not allow incorporation by reference of arguments contained in briefs filed with other tribunals, or briefs attached as appendices, as a substitute for the proper presentation of arguments in the body of the appellate brief.[48] Were we to countenance such incorporation by reference as an acceptable manner for a litigant to present an argument to an appellate court of this

47. Attorney Raup entered his appearance as counsel for purposes of Appellant's motion in the trial court; however, he is not a signatory to Appellant's brief filed with our Court nor does our appellate docket reflect that Attorney Raup has entered an appearance on Appellant's behalf.

48. Pa.R.A.P. 2137 allows a party to an appeal which has multiple parties or involves consolidated cases to incorporate by reference parts of briefs which another party has filed with the **appellate** court which is considering the appeal.

Commonwealth, this would enable wholesale circumvention of our appellate rules which set forth the fundamental requirements every appellate brief must meet. *See, e.g.*, Pa.R.A.P. 2135(a)(1) (establishing length of principal brief at no greater than 70 pages); [49] *Commonwealth v. (James) Lambert*, 568 Pa. 346, 356 n. 4, 797 A.2d 232, 237 n. 4 (2001) (Opinion Announcing Judgment of the Court) (refusing to consider claims not argued in the brief but incorporated by reference from motions made at trial and observing that "[t]o permit appellant to incorporate by reference his previous motions would effectively allow him to more than double the original briefing limit.").[50] The briefing requirements scrupulously delineated in our appellate rules are not mere trifling matters of stylistic preference; rather, they represent a studied determination by our Court and its rules committee of the most efficacious manner by which appellate review may be conducted so that a litigant's right to judicial review as guaranteed by Article V, Section 9 of our Commonwealth's Constitution may be properly exercised. Thus, we reiterate that compliance with these rules by appellate advocates who have any business before our Court is mandatory. Consequently, since Appellant has failed to develop or present a proper argument with respect to these constitutional claims, we find them waived in this direct appeal.

## B. *Constitutional challenge to the use of lethal injection as cruel and unusual punishment*

 Appellant next argues that Pennsylvania's method of capital punishment, lethal injection, constitutes cruel and unusual punishment under the Eighth Amendment to the United States Constitution and Article I, Section 13 of the Pennsylvania Constitution. Since the United States Supreme Court had

49. A litigant may always seek this Court's permission to extend the page limits for briefs by making an application for relief under Pa.R.A.P. 123. See Darlington, Shuckers, Brown, *Pennsylvania Appellate Practice*, § 2135:2. Our docket does not reflect that Appellant made such an application; however, the Commonwealth did request such permission, and it was granted.

50. Appellant's Brief is 66 pages in length, and the length of the brief he seeks to incorporate in its entirety is 45 pages.

not, at the time he filed his appeal, rendered its decision in *Baze v. Rees*, 553 U.S. 35, 128 S.Ct. 1520, 170 L.Ed.2d 420 (2008), regarding whether Kentucky's three drug method of lethal injection violated the Eighth Amendment's prohibition against cruel and unusual punishment, Appellant requested that his execution be stayed pending the high Court's decision. As the Supreme Court has rendered its decision in *Baze*, and held that Kentucky's chosen method of execution does not contravene the Eighth Amendment, Appellant's request for a stay is now moot.

Appellant's substantive claim regarding whether Pennsylvania's particular manner of conducting an execution utilizing lethal injection via administration of a drug combination violates the Eighth Amendment to the United States Constitution or Article I, Section 13 of the Pennsylvania Constitution is, as many of his other claims, waived for failure to develop it in any meaningful fashion to permit our appellate review.

## VIII.

■ Having addressed each of Appellant's claims of trial error, this Court is also obligated to conduct a statutory review of his death sentence. In accordance with Section 9711(h)(3) of the Judicial Code, this Court is required to affirm the sentence of death unless we determine:

(i) the sentence of death was the product of passion, prejudice, or any other arbitrary factor; or

(ii) the evidence fails to support the findings of at least one aggravating circumstance specified in subsection (d). 42 Pa.C.S.A. § 9711(h)(3)(i), (ii).

After a searching review of the entirety of the trial record below, we conclude that the unanimous sentence of death imposed by the jury was not the product of any passion, prejudice, or arbitrary factor considered by the jury but, rather, was supported by the trial evidence. Further, the trial evidence discussed above is sufficient to establish beyond a reasonable doubt all of the aggravating factors found by the jury. Since the jury concluded that these aggravating circum-

stances outweighed the one mitigating circumstance they found, the jury was statutorily required to impose this sentence of death under 42 Pa.C.S.A. § 9711(c)(1)(iv), and we are bound to affirm it.

Since we are upholding Appellant's death sentence, the Prothonotary of this Court is directed to transmit to the Governor's office a full and complete record of the trial, sentencing hearing, imposition of sentence, and the opinion and order of our Court in accordance with 42 Pa.C.S.A. § 9711(i).

Judgment of sentence affirmed. Jurisdiction relinquished.

Chief Justice CASTILLE, Justices EAKIN, BAER, McCAFFERY and ORIE MELVIN join the opinion.

Justice SAYLOR files a dissenting opinion.

Justice SAYLOR, dissenting.

The majority determines that, for purposes of the Sixth Amendment, a state policeman did not deliberately elicit incriminating information from Appellant after he had invoked his right to counsel. *See* Majority Opinion at 485–86, 12 A.3d at 325. I respectfully differ with this conclusion.

At the time the trooper approached Appellant accompanied by three other government agents, Appellant's hands and feet were shackled, and he complained of a lack of sleep. *See* N.T., Nov. 10, 2004 (a.m.), at 25–26. In the dialogue that ensued, Appellant was advised that his chosen counsel would not represent him and, likely, he would have no access to another lawyer for several days. In this setting, and despite Appellant's express, serial invocations of his right to counsel—the trooper: encouraged Appellant to tell police "his side of the story," *id.* at 28; indicated that it was "the right decision" and "wise" to do so, *id.* at 27, 29; cautioned that another individual who failed to tell his side of the story "ended up getting the death penalty" and was "on death row," even where he "did not pull the trigger," *id.* at 29, 44; and explained that, although Appellant's attorney probably would advise him not to speak to police, the decision would be Appellant's alone. *See id.* at 28–29.

At argument before the suppression court, the prosecutor acknowledged that, in the above-described remarks, the trooper was encouraging Appellant to talk to police, with the caveat that the trooper sought to address only future, counseled cooperation. *See* N.T., Nov. 10, 2004 (p.m.), at 13, 19. The prosecutor also conceded that the trooper "said things that struck a responsive chord" and may have employed "subtle compulsion." *Id.* at 13–14. He emphasized, however, that there were no threats, tricks, or cajoling, as he believed would be necessary to result in a constitutional violation.

For purposes of the Sixth Amendment, once a defendant invokes his right to counsel, that invocation is to be honored by law enforcement. In this regard, the Sixth Amendment has been said to guarantee the accused the right to rely on counsel as a "medium" between him and the government, and law enforcement officers have an "affirmative obligation not to act in a manner that circumvents and thereby dilutes [this] protection." *Maine v. Moulton,* 474 U.S. 159, 171, 176, 106 S.Ct. 477, 484, 487, 88 L.Ed.2d 481 (1985). Furthermore, the United States Supreme Court has admonished that "knowing exploitation by the State of an opportunity to confront the accused without counsel being present is as much a breach of the State's obligation not to circumvent the right to the assistance of counsel as is the intentional creation of such an opportunity." *Id.* at 176, 106 S.Ct. at 487. As the majority recognizes, the "deliberate elicitation" litmus established for purposes of the Sixth Amendment is a lower one than the interrogation threshold under the Fifth Amendment, which was the subject of *Rhode Island v. Innis,* 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). *See Fellers v. U.S.,* 540 U.S. 519, 524–25, 124 S.Ct. 1019, 1022–23, 157 L.Ed.2d 1016 (2004).[1]

Here, by the Commonwealth's own admission, the trooper did exploit his encounter with Appellant in the absence of

1. The United States Supreme Court has recently altered the path of Sixth Amendment jurisprudence concerning the point at which a bright-line prohibition against uncounseled interrogation (and presumably any lesser deliberate elicitation) attaches. *See Montejo v.*

counsel. It very well may be that the trooper intended the effect would be postponed to a time when counsel would be present. Nevertheless, the fact remains that the trooper overtly sought to counteract advice he anticipated counsel would provide, going so far as to suggest that Appellant's adherence to such advice would yield a greater likelihood of his receiving a sentence of death. *Cf. State v. Emery*, 131 Ariz. 493, 642 P.2d 838, 847–48 (1982) (finding that officers' discussion of the gas chamber with a defendant who had invoked his Miranda rights represented "impermissible conduct by police," and that officers should have known such remarks were reasonably likely to elicit an incriminating response). Moreover, while I am not an expert in human psychology, I believe the majority underestimates the impact of employing the prospect of the death penalty to encourage a statement (future or not) from a prisoner in state custody who is: accused of killing two law enforcement officers; in the presence of four government agents; shackled; complaining of a lack of sleep; seeking counsel to serve in the medium role; and apprised that it will be several days before counsel will be made available. Again, I also do not see why it should matter, for Sixth Amendment purposes, that the intended effect of the trooper's exploitation of the circumstances may have occurred prematurely.

As I believe the trial court erred in denying suppression, I would remand for a determination by that court, in the first instance, as to whether such error may be deemed harmless.

*Louisiana,* 556 U.S. 778, ——, 129 S.Ct. 2079, 2091, 173 L.Ed.2d 955 (2009) (overruling *Michigan v. Jackson,* 475 U.S. 625, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986)). The holding of *Montejo* is not directly relevant here, but I recognize that some of its reasoning suggests a majority of Justices on the High Court may be inclined to further reorder the prevailing scheme of protections for the right to counsel. Nevertheless, I am in agreement with the majority here concerning the general parameters of the presently extant principles we are bound to enforce, as set forth above.